UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DR. CHARLES GIGER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 09 CV 4060 |
| v. | ) | |
| | ) | Judge Joan B. Gottschall |
| JAMES AHMANN, GARY LANGE, | ) | |
| JW COLE FINANCIAL, INC., ADLEY | ) | |
| ABDUL WAHAB, A&O RESOURCE | ) | |
| MANAGEMENT, LTD., and A&O LIFE | ) | |
| FUND, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION & ORDER**

Defendants JW Cole, James Ahmann, and Gary Lange (collectively "Defendants")[1] have moved for judgment on the pleadings[2] in this securities suit by plaintiff Dr. Charles Giger. Giger invested money with entities affiliated with A&O Resource Management, Ltd. ("A&O"), a party which was named as a defendant in Giger's complaint but has never been served with process. A&O and several of its affiliates are currently in bankruptcy. Defendants contend that the suit is premature because Giger's investment may yet be repaid with funds recovered in the A&O bankruptcy proceedings. Until the bankruptcy concludes, Defendants argue, Giger has not sustained any damages. The court disagrees and denies Defendants' motion.

---

[1] Defendant JW Cole independently filed this motion. The court subsequently granted the request of defendants Ahmann and Lange to join. (Doc. 44.)

[2] Defendants' motion is captioned Motion to Dismiss. However, Defendants have already filed answers (docs. 24, 25, 27), and the motion cites Rule 12(c) (Mot. at 1).

# I. Background[3]

Plaintiff Dr. Charles Giger is a physician, and defendant James Ahmann, an investment advisor previously employed by broker/dealer JW Cole, was one of Giger's patients. (Compl. ¶¶ 1-2.)[4] During an office visit in March 2006, Ahmann offered to provide Giger with some free advice on investing for retirement. Soon thereafter, Ahmann began an effort to convince Giger to make substantial investments in A&O's business. (*Id.* ¶¶ 17-18.)

Ahmann represented that A&O was in the business of bonded life settlements. (*Id.* ¶ 18.) A life settlement is an arrangement where the holder of a life insurance policy agrees to name an investor as the policy beneficiary in exchange for a lump sum payment. The investor remains responsible for paying premiums to continue the policy in effect. To hedge the risk, the investor can have the policy "bonded" by paying an additional premium to an insurer who agrees to buy out the policy after a specific date. (*Id.* ¶¶ 12-13.)

Giger was asked to make an initial investment in the form of a loan to Houston TangleWood Partners, LLC ("Houston TangleWood"), an entity affiliated with and controlled by A&O, for close to $1 million. Defendants Ahmann and Gary Lange met with Giger and explained how the investment was supposed to work. A&O would purchase insurance policies issued by "A-rated" companies. (*Id.* ¶ 20.) A qualified company would review the policies to ensure the life expectancy of the holder fell within

---

[3] The facts described here, which are taken as true, come from Giger's complaint.

[4] The following citation conventions will be used in this opinion: citations to the docket will appear as Doc. __; citations to the complaint (doc. 1) will appear as Compl. ¶ __; citations to the Defendants' motion (doc. 38) will appear as Mot. at __; citations to plaintiff's response (doc. 45) will appear as Resp. at __; citations to Defendants' reply (doc. 46) will appear as Reply at __.

a prescribed range.  (*Id.* ¶ 22.)  The life settlements would be bonded by a "5A rated" insurer called Provident Capital Indemnity, Ltd. ("PCI"), a firm that, according to Ahmann, "insured all Hyundai automobiles imported to the United States."  (*Id.* ¶ 20.)  Giger's investment would be used to purchase three separate policies and to pre-pay all the policy premiums for the life expectancy of the insured and the full cost of the bonding contract.  (*Id.* ¶¶ 25, 27.)  Giger would be promised a rate of return of at least 12% per year, and he would collect when the insureds died or the bond term came to an end.  (*Id.* ¶ 26.)

Giger signed paperwork provided by Ahmann and Lange in April 2006 and deposited $999,084.34 into an escrow account established by Houston TangleWood.  (*Id.* ¶ 30.)  The agreement established a non-recourse line of credit and granted Giger a security interest in the escrow account.  (*Id.*).

In September 2007, Ahmann convinced Giger to make a second investment and provided similar assurances about the secure nature of the investment.  (*Id.* ¶¶ 33-42.)  This second investment is the subject of a separate arbitration and is not at issue in this case.  (*Id.* ¶ 61.)

After making the two investments, Giger began to learn some troubling information about A&O and the other entities involved with the bonded life settlements.  In early 2008, Giger received notice that the Texas State Securities Board had issued a cease and desist order in November 2006 commanding PCI to stop engaging in the unauthorized business of insurance.  Apparently PCI, a Costa Rica corporation, was not authorized to do business anywhere in the United States and did not, in fact, insure all Hyundai cars imported into the United States.  The Texas order also named the officers of

A&O and the managers of Houston TangleWood. (*Id.* ¶¶ 43-45.) Additionally, the Illinois Department of Securities issued a Temporary Order of Prohibition against A&O and affiliates in December 2007. A&O settled with the Illinois Department of Securities, acknowledging the sale of unregistered securities and agreeing to pay a fine. Several A&O accounts were then frozen. (*Id.* ¶¶ 50-51.)

The alarming news continued when Giger learned that A&O had failed to make several premium payments on one of the life insurance policies purchased with money from the second investment. This news contradicted assurances by Ahmann that premiums for all policies, for both investments, would be paid in advance with the money contributed by Giger. (*Id.* ¶ 46.) Several individuals involved with the life settlements had criminal records. PCI's senior underwriter had been convicted of conspiracy to commit mail and wire fraud in 1997 in Florida. (*Id.* ¶ 44.) Adley Wahab, an A&O official, had been on probation following a felony charge of forgery of a financial instrument. (*Id.* ¶ 50.) The head of the company paid to assess the life expectancy of the holders of the life insurance policies was also a convicted felon. (*Id.* ¶ 47.)

In July 2008, Houston TangleWood had its corporate charter forfeited in Texas for unexplained reasons. (*Id.* ¶ 52.) And Giger has learned that one of the policies purchased with his initial investment was a "wet paper" policy, meaning that the policy was less than two years old and was thus subject to a greater risk of being contested by the insurer. (*Id.* ¶ 56.)

In March 2008, counsel for Giger gave notice to Ahmann, Lange, A&O, and Houston TangleWood that Giger sought to rescind the contract and demanded return of the two investments. (*Id.* ¶ 60.) In January 2009, Giger initiated arbitration with

Ahmann and another party involved with the second investment. The arbitration is still pending. (*Id.* ¶ 61.)

Then, on July 7, 2009, Giger filed a four-count complaint with this court. Count I is a federal securities law claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. The other counts raise state law claims for common law fraud, as well as under the Illinois Securities Law of 1953, 815 Ill. Comp. Stat. 5/1 *et seq.*, and the Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1 *et seq.* After the complaint was filed, A&O filed a petitioner under Chapter 11 of the Bankruptcy Code. (Mot. at 2.) Giger filed Proofs of Claim with the bankruptcy court, asserting his right to collect from A&O. (Mot., Exhibit A.) Defendants each filed separate answers in this action and now jointly move for judgment on the pleadings.

## II. ANALYSIS

In deciding a motion for judgment on the pleadings, the court applies the same standard as a motion to dismiss for failure to state a claim under Rule 12(b)(6). *Guise v. BWM Mortgage, LLC*, 377 F.3d 795, 798 (7th Cir. 2004). Under this standard, the court must "construe the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [the plaintiff's] favor." *Tamayo v. Blagojevich,* 526 F.3d 1074, 1081 (7th Cir.2008). Legal conclusions, however, are not entitled to any assumption of truth. *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). A plaintiff generally need not plead particularized facts; Federal Rule of Civil Procedure 8(a)(2) requires that the complaint set forth only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P.

8(a)(2). Still, the factual allegations in the complaint must be sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).

Defendants have described Giger's claims as "unripe" and contend that the court lacks subject matter jurisdiction. (Mot. at 1; Reply at 6.) Ripeness is a doctrine of justiciability "invoked to determine whether a dispute has matured to a point that warrants decision." 13B Charles Alan Wright et al., Federal Practice and Procedure § 2532 (3d ed. 2008). Ordinarily, ripeness appears in case law as a public-law doctrine that permits courts to dispose of a dispute based on considerations such as "the need to defer to other branches of the federal government; avoidance of unnecessary constitutional decision; comity to state institutions; and statutory severability." *Id.* § 2532.1. *See, e.g.*, *Nat'l Park Hospitality Ass'n v. Dept. of Interior*, 538 U.S. 803, 807-08 (2003) ("Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"). These considerations are not in play in this private securities litigation. Whether the issue presented by this motion is properly labeled as one of "ripeness," however, is less important than identifying the question which the court must answer. In essence, the Defendants ask the court to hold that Giger has failed to state a claim because he has not alleged any injury.[5]

---

[5] The court focuses its analysis on Count I of Giger's complaint. Because the other claims arise under state law and there appears to be no diversity (*see* Compl. ¶ 1-3), the court could decline to exercise jurisdiction unless Giger has properly alleged a violation of federal securities law. 28 U.S.C. § 1367(c)(3).

Defendants argue that Giger's damages would be calculated by taking the difference between the actual value of the security and the original investment. Because it is not yet clear what Giger might recover from the A&O bankruptcy, no actual value can be established for the loan. (Reply at 2.) There are two flaws in this logic. First, there is more than one possible measure of damages in a federal securities suit. *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 441-42 (7th Cir. 1987). Sometimes a plaintiff will be entitled to a "rescissionary" measure of damages, *id.*, which, in this case, would amount to the return of Giger's initial investment. *Nat'l Jockey Club v. Ganassi*, No. 04 3743, 2009 WL 2177217, at *5 (N.D. Ill. July 21, 2009) (return of initial investment is an appropriate remedy where fraudulent inducement is alleged). In his response, Giger argues for just this measure of damages. (Resp. at 5-6.) The court need not decide the correct damages formula at this early stage, but a calculation appears more ascertainable than Defendants posit.

Second, there is no requirement that Giger seek recovery from A&O before going after others who are equally liable. Where two parties are jointly and severally liable, each party is independently responsible for the entire amount of damages. *United States v. Scop*, 940 F.2d 1004, 1010 (7th Cir. 1991). One who participates in a scheme to fraudulently induce a lender to extend credit to a third party is a joint tortfeasor. *A.I. Credit Corp. v. Hartford Computer Group, Inc.*, 847 F. Supp. 588, 599 (N.D. Ill. 1994). If Giger has a cause of action against A&O, then he can opt to collect from Defendants who, according to Giger's allegations, would be jointly and severally liable.

A cause of action for fraudulent misrepresentation accrues at the time the plaintiff acts on a false representation, and the plaintiff may seek rescission or damages as soon as

he or she learns of the fraud. *McCool v. Strata Oil Co.*, 972 F.2d 1452, 1460 (7th Cir. 1992) ("In securities fraud cases, the federal rule is that the plaintiff's cause of action accrues 'on the date the sale of the instrument is completed.'"). *Accord Oppenheimer v. Harriman Nat'l Bank & Trust Co. of City of N.Y.*, 301 U.S. 206, 213-14 (1937) ("[W]hen the bank [a broker] by false representations sold him the stock . . . it immediately became bound to make restitution."). If Giger can prove the other elements of his claim, he has a right to recover now, rather than later.[6] If A&O's directors had fled the country rather than declared bankruptcy, Giger would not have to wait and see if they return to pay off A&O's debt.

Defendants cite a series of cases where courts held that a creditor in bankruptcy could not proceed in a fraud action against a potential debtor of the estate. (Mot. 3-4 (citing *Barnett v. Stern*, 909 F.2d 973, 977 n.4 (7th Cir. 1990); *Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Markets, LLC*, No. 07 Civ. 8139, 2008 WL 3925175, *4 (S.D.N.Y. Aug. 26, 2008); *Hartford Cas. Ins. Co. v. Borg-Warner, Corp.*, No. 88 C 0783, 1989 WL 95806, at *2 (N.D. Ill. Aug. 11, 1989) (involving state rehabilitation proceedings rather than bankruptcy); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1106 (2d Cir. 1988)). These cases held that a fraud suit was premature because, if the estate collects the debt and distributes it through bankruptcy, the creditor will not suffer any damages. These cases are not applicable to Giger's suit because, as

---

[6] Defendants do not argue that Giger has failed to plead any other element of a Rule 10b-5 claim; thus, the court will not consider whether those elements are adequately alleged.

the Defendants concede, the bankruptcy trustee has no cause of action against Defendants. (Reply at 1.)[7]

### III. CONCLUSION

For the reasons stated above, Defendants motion is denied.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: June 15, 2010

---

[7] Defendants disclaim any interest in staying the litigation, rather than dismissing it. (Reply at 6.) Even if they did, the automatic stay provision of the Bankruptcy Code shields only the debtor and does not extend to those who are jointly liable. *Pitts v. Uarco Indus., Inc.*, 698 F.2d 313, 314 (7th Cir. 1983).