# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| DR. CHARLES GIGER, | ) |
|  | ) |
|  | ) |
| Plaintiff, | ) Case No. _____ |
|  | ) |
| vs. | ) |
|  | ) |
| JAMES AHMANN, GARY LANGE, JW COLE | ) |
| FINANCIAL, INC., ADLEY ABDULWAHAB, A&O | ) |
| RESOURCE MANAGEMENT, LTD., and A&O | ) |
| LIFE FUND, LLC, | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

## COMPLAINT

Plaintiff, Dr. Charles Giger, by and through his attorneys, Chapman and Cutler, LLP, and for his Complaint against defendants James Ahmann, Gary Lange, JW Cole Financial, Inc., Adley Abdulwhab, A&O Resource Management, Ltd., and A&O Life Fund, LLC, (collectively, *"Defendants"*), respectfully states as follows:

## I. THE PARTIES

1. Plaintiff Dr. Charles Giger (*"Giger"* or *"Plaintiff"*) is an individual currently residing, and at all relevant times herein has resided, in Elmhurst, Illinois.

2. Defendant James Ahmann (*"Ahmann"*) is an individual currently residing, and at all relevant times has resided, in Bloomingdale, Illinois. At all relevant times Ahmann was a certified estate planner, certified financial divorce practitioner, and investment advisor affiliated with Defendant J.W. Cole Financial, Inc. (*"JW Cole"*), an independent broker/dealer servicing, *inter alia,* Registered Representatives and their clientele, including Giger. According to the State of Illinois Department of Financial and Professional Regulation, Defendant Ahmann has held

2549951.01.16.doc

insurance licenses for life accident and health since 1995, for property and casualty since 1996, and for variable contracts since 1998. According to the Financial Industry Regulatory Authority (*"FINRA"*), Defendant Ahmann passed both the Series 63 and 65 examinations in 1998 and 2001.

3.    Defendant Gary Lange (*"Lange"*) is an individual who, upon information and belief, currently resides in, and at all relevant times has resided, in Elgin, Illinois. Upon information and belief, Lange was at all relevant times a financial and insurance consultant and a partner of Ahmann in an entity called "Senior Tax Advisors Group." According to the Illinois Department of Financial and Professional Regulation, Lange held a Series 6 securities license from February of 2001 to December of 2001, and has been licensed to sell life, accident, health and variable annuities contracts since October, 1983 until the present.

4.    Defendant JW Cole was at all relevant times a registered broker/dealer, having its principal place of business in Tampa, Florida.

5.    Defendant A&O Resource Management, Ltd. (*"A&O"*) was at all relevant times a life settlement broker, having its principle place of business in Houston, Texas.

6.    Defendant A&O Life Fund, LLC (*"A&O Life Fund"*) was, upon information and belief, at all and relevant times an entity established to sell life settlements, and having its principal place of business in Chicago, Illinois.

7.    Defendant Adley Abdulwahab (*"Wahab"*) is an individual who, upon information and belief, currently resides in, and at all relevant times has resided, in Spring, Texas. Wahab is the National Accounts Director for A&O Resource Management, LTD, and managing member for A&O Life Fund, LLC, and, upon information and belief, a partner in A&O Life Funds, L.P.

## II. JURISDICTION

8. This Court has subject matter jurisdiction over Giger's federal securities law claims pursuant to Section 10(b) of the Exchange Act of 1934 [15 USC §78j(b) and SEC Rule 10b-5 (17 CFR §240.10b-5) [promulgated thereunder], and 28 USC §1331.

9. This Court has supplemental subject matter jurisdiction over Giger's state law claims pursuant to 28 U.S.C. §1367 because they are so related to the federal claims that they form a part of the same case or controversy under Article III of the United States Constitution.

10. This Court has personal jurisdiction over JW Cole because, as set out fully below, at all relevant times to this action JW Cole maintained contacts with the State of Illinois by: (a) transacting business with, (b) committing certain tortious acts against, and (c) entering into agreements through its representatives in the State of Illinois, with injury resulting in this district. Based on these contacts this Court has personal jurisdiction over JW Cole under Section 22(a) of the Securities Act [15 U.S.C. §77v(a)], and Illinois' Long-Arm Statute [735 ILCS 5/2-209(a)(1), (2), (7) and (c)].

11. Venue is proper in the Northern District of Illinois pursuant to 28 USC §1391(b) and (d), and Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] because the acts, practices and courses of business constituting the claims alleged herein occurred within the jurisdiction of the United States District Court for the Northern District of Illinois.

## III. LIFE SETTLEMENT INDUSTRY

### A. LIFE SETTLEMENT HISTORY

12. Life settlements emerged in recent years as an offshoot of the viatical settlement industry which developed in the 1980s as a source of liquidity for HIV and AIDS patients and other terminally ill life insurance owners with life expectancies of less than two years. In contrast to viaticals, life settlements involve policyholders who are not terminally ill, but generally have a life expectancy of between two to fifteen years.

3

13.     Until recently, the owner of a life insurance policy who no longer wanted it or could not afford it had two options: he(she) could let it lapse or surrender it to the issuer for the cash surrender value.   The emergence of a secondary market for existing life insurance policies provided a third alternative: the sale of the policy to a third party.   The value of a particular life settlement depends mainly on two factors: the life expectancy of the insured, and the premiums required to maintain the policy.   "Bonded" life settlements involve a third party bonding company that assumes the risk that the policy will be paid by a date certain. In other words, at the end of the bonding period, the bonding company pays out the death benefit to the owner of the life settlement if the insured has not passed away, and then assumes ownership of the policy. In this way investors are assured of obtaining a payout at a defined rate of return, on a date certain.   Thus, the bonding company who assumes the risk of the bonded life settlement provides a third major factor in determining the value of a bonded life settlement insurance policy.

## IV.     FACTUAL BACKGROUND TO GIGER'S INVESTMENTS

### A.     GIGER'S INVESTMENTS IN BONDED LIFE SETTLEMENT CONTRACTS

14.     Defendant Ahmann, a former patient of Giger, first approached Giger in or about March, 2006 to solicit investment in what Defendant Ahmann described to Giger as "guaranteed bonded life settlements".   Prior to this time, Giger was not a client of either Defendant Ahmann or Lange.

15.     At that time Giger had been a practicing physician in Elmhurst, Illinois since April of 1986, had taken over a practice from a retiring physician, and had "inherited" Defendant Ahmann's parents as patients.   In the early 1990's, Giger began a physician/client relationship with Defendant Ahmann's brother, Don, and had been Defendant Ahmann's primary physician for approximately three years.

4

16.    Giger's relationship with Defendant Ahmann and his family as doctor/patient created an implied trust between them. At the time Defendant Ahmann approached Giger in March, 2006, Giger was not a sophisticated investor, in that he had absolutely no idea what constituted a security and/or a private placement of such a security, which naïveté Defendant Ahmann was clearly aware of. Giger had never invested in any annuities, hedge funds, futures, derivatives, puts, margins, stock options or any advanced trading techniques, and had only purchased a few stocks on the advice of his relatives or friends. From 1990 to the present, Giger has maintained a retirement plan administered by a financial advisor, who has recommended and executed purchase of individual stocks. Since 1990, Giger has not purchased any individual stocks for his retirement plan, although he had invested in the construction of two nursing homes on the advice of his brother, who was then the CFO of the related nursing home chain.

17.    During an office visit to Giger Defendant Ahmann represented to Giger that he was versed in stocks and finance. In response to a comment from Giger as to the need for advice on stocks in his retirement plan, Defendant Ahmann, then a Giger patient, offered to review Giger's retirement stocks and give recommendations, without charge. By advising Giger in this way, Defendant Ahmann gained Giger's confidence and trust beyond that of a patient.

18.    After gaining Giger's trust and confidence, and in now describing bonded life settlements to Giger, Defendant Ahmann initially gave assurances to Giger that these investments were guaranteeing a 10% rate of return on investments of more than $100,000, and 12% on any investment over $1,000,000. Defendant Ahmann further described the investments as being offered by an entity called A&O Resource Management, Ltd. (above and hereafter "A&O"), and involving A&O's purchase of life insurance policies already issued on individuals, whose life expectancies were verified by competent medical personnel, such that the face amounts of the policies themselves, when compared to the life expectancies of the insureds,

5

"guaranteed" a return of investment that well exceeded other available investments in the marketplace. (*See* Exhibit 1 hereto).

19.    Defendant Ahmann also represented to Giger that investments in such bonded life settlements would be further secured by a bonding company, Provident Capital Indemnity, Ltd. (*"PCI"*), who would contract to make payment on the life insurance policies in the event that the policies did not pay off within a defined time period by virtue of the death of the insured(s).

20.    Defendant Ahmann further stated to Giger that all of the insurance companies providing the life insurance policies purchased by A&O were "A-rated" and that the bonding company, PCI, was 5A rated. When Giger inquired as to how such a company located in Costa Rica could have obtained what appeared to be high ratings (Giger had no specific knowledge of these ratings or how they were generated), Defendant Ahmann replied that PCI insured all Hyundai automobiles imported to the United States and thus held the highest rating, 5A, by rating agencies such as Dunn and Bradstreet, which Ahmann stated was similar to a Moody's or Standard and Poor's rating agency. (*See* Exhibit 2 attached hereto). Ahmann further told Giger that PCI would review the policies with life expectancies and give its approval to provide bonding protection even before A&O would purchase the policy. Defendant Ahmann also assured that major insurance companies, for example "John Hancock", would go out of business before PCI would.

21.    Defendant Ahmann further advised Giger that the owners of A&O had previously been employed by a company that resold insurance policies exclusively to large institutions like banks and hedge funds, but that the company's current focus was to service the "retail" marketplace with investors such as Giger. Defendant Ahmann also stated to Giger that A&O would always carry $80 to $100 million dollars worth of policies as a constant inventory, but in

response to Giger's request for financial statements for A&O, Defendant Ahmann told Giger that since A&O was a privately held company, A&O does not disclose financial statements.

22.    Defendant Ahmann further explained that all of the policies were reviewed by a qualified life expectancy company which employed medical doctors to determine life expectancy, and that Defendant Ahmann had done his own "due diligence" to ensure the safety of these investments, and the representations he was making.

23.    At that time, Defendant Ahmann also gave Giger his business card reflecting that he was a certified estate planner and certified financial divorce practitioner (*see* Exhibit 3 attached hereto), although Ahmann at that time was also associated with J.W. Cole, an independent broker/dealer, and had passed both the Series 63 and 65 examinations in 1998 and 2001, as reflected by FINRA records.

24.    After having these investments first explained to him by Defendant Ahmann, Giger next scheduled a meeting with Defendant Ahmann in April, 2006 in order to discuss the investment further and consummate an investment in these products.  On April 12, 2006, Defendant Ahmann came to Giger's residence, along with another person, Defendant Lange, who Giger had not met before, but who Defendant Ahmann now described as his "partner".  At that time, Defendants Ahmann and Lange again explained how these investments were structured to both Giger and his wife consistent with the prior representations Ahmann had made to Giger as outlined above, and provided paperwork prepared for execution by Giger to allow for this first investment. At no time during this meeting or thereafter did Defendant Lange make any financial inquiries of Giger to determine the suitability of this investment vehicle being sold to Giger.

25.    The paperwork provided to Giger included three separate but otherwise identical Line of Credit Loan Agreements, Line of Credit Promissory Notes, Security Agreements, and

Escrow Instructions (collectively, the *"Loan Documents"*) for investment in three (3) separate life insurance policies. (*See* Ex. 4 hereto) These three investments were to be broken down as follows: two investments from Giger's IRA, each for $199,542.17 in principal, and the third from his non-retirement funds for $600,000 in principal, totaling $999,084.34 in principal investment.

26.     Defendants Ahmann and Lange further explained at this meeting that the principal amount of each of these investments would be guaranteed at a rate of return of at least 12% per year, and at the same time provided documentation to that effect. (*See* Exhibit 1 hereto) Defendants Ahmann and Lange also explained that these returns would be eligible for capital gains tax treatment, and if the insured passed away before the "term", Giger would be paid out immediately, but he would have to consult a tax attorney to see if the proceeds were tax-free (since it was a life insurance product).

27.     Defendants Ahmann and Lange further stated to Giger at the meeting on April 12, 2006 that the mechanics of these investments were as follows: funds received by investors like Giger would be deposited with an escrow company, Bayou City Escrow, Inc. (*"Bayou Escrow"*). Thereafter A&O, by and through a company called Houston TangleWood Partners, LLC (*"Houston TangleWood"*), would actually purchase the policy using funds deposited in the escrow maintained at Bayou City, after receiving enough money from investors such as Giger to purchase the policy, prepay the premiums due on the insurance policy through the life expectancy of the insured, and pay in full the cost of obtaining the bonding contract from PCI. Houston TangleWood would then execute the Loan Documents, including the Line of Credit Promissory Note, in favor of Giger, as well as the Security Agreement to collateralize the return of the principal investment, plus the guaranteed return to Giger.

28.    Giger was specifically told at this meeting by Defendants Ahmann and Lange that A&O, through Houston TangleWood, would pay all of the premiums for the life insurance policy ahead of time through the life expectancy of the insured, as well as all payments necessary to procure the contract from PCI, the bonding company, ahead of time, so that there would never be a chance that either the policy itself, or the bonding contract with PCI, would lapse for failure to pay premiums or the bonding fee.

29.    At this meeting Giger inquired of Defendants Ahmann and Lange where it was reflected in any of the documents that these life insurance premiums and the cost of procuring the bond from PCI were to be funded/paid in full, and that Giger would require such a representation in writing before he would invest.  Defendants Ahmann and Lange informed Giger and his wife that the pre-payment of the premiums absolutely occurred with these investments, and that they would furnish such documentation in short order.  Thereafter, on or about May 31, 2006, Defendant Ahmann provided Giger with such a written representation from a Mr. Adley Wahab *("Wahab")*, National Accounts Director for A&O, that all life insurance premiums would be paid in full, as would the bonding fee to PCI, along with a number of other representations as to these investments, a copy of which is attached hereto as Exhibit 5.

30.    Based upon these express representations, Giger agreed to invest a total of $999,084.34 in principal (collectively, the *"First Investments"*), and executed the Loan Documents.  Giger was then granted via the Loan Documents a security interest in the escrow maintained at Bayou City, the funds of which in turn were used to purchase the three insurance policies, referred to as the Frater, Boseeker, and Server policies (collectively, the *"Policies"*).

31.    At the time that Giger executed the Loan Documents related to the First Investments, Giger noticed that Defendant Lange, who Giger had just met for the first time at this April 12, 2006 meeting, was identified as the record seller on all of the First Investments

9

paperwork. (*See* Exhibit 6 hereto). When Giger noticed this, he asked Ahmann why Lange appeared as the seller, not Ahmann. Ahmann represented to Giger that Defendant Lange was one of only twelve people in the country who could sell this type of investment, and that he was Ahmann's "partner."

32.    However, neither at that meeting or at anytime thereafter did Defendants Ahmann or Lange inform Giger that A&O was not, in fact, registered with the SEC or with the State of Illinois to do business at the time the First Investments were made. Also, Defendants Ahmann and Lange failed to mentioned that PCL, "the bonding company", was not registered to do business anywhere in the United States.

## B.    SECOND INVESTMENT IN BONDED LIFE SETTLEMENT CONTRACTS

33.    By February, 2007 Defendant Ahmann had left JW Cole and had then become a Registered Representative with Pavek Investments, Inc. (*"Pavek"*).    Defendant Ahmann thereafter called Giger on multiple occasions to try and entice Giger to invest in additional bonded life settlement contracts. In both letter and telephone contact by Defendant Ahmann, Giger was solicited to invest in "Life Fund 5.1, LLC," an Illinois investment fund offering "Capital Appreciation Bonds" backed by "bonded" life insurance policies. (*See* Exhibit 7 hereto).    Giger, however, indicated to Defendant Ahmann that he would never invest as a non-owner of a policy again, and desired to wait until the First Investments paid off before even considering any additional investments.

34.    After several more calls from Defendant Ahmann, Giger then further advised Defendant Ahmann during this period that Giger had three criteria to make a second investment: (i) Giger's brother, whose profession was at this time that of a consultant for nursing homes needed to approve the investment, (ii) Giger had to be the actual owner of the policy, not just an investor/secured lender as had been the case with the First Investments, and (iii) the insured must

10

be of a certain health that provided an additional level of security that the policy would pay off before the end of the projected life expectancy.

35.    Thereafter, in or about August, 2007, Defendant Ahmann contacted Giger and told Giger that there was a policy available (the *"Mangione Policy"*) for purchase that satisfied Giger's criterion, but that in order to be the direct owner of the Mangione Policy, Giger must individually invest more than $1 million. Defendant Ahmann then further promised, as yet another inducement to Giger, that there would be a 15% guaranteed return, with a slightly more than a four year time frame.

36.    After receiving further assurances from Defendant Ahmann that the Mangione Policy now available met Giger's requirements, in early September, 2007 Giger met with Defendant Ahmann to review and sign documents for this second investment. At this time Giger and Defendant Ahmann also executed a "New Account" form with Pavek Investments, Inc. which Ahmann completed, a copy of which is attached hereto as Exhibit 8.

37.    At this meeting, and in reviewing the terms of the Mangione Policy, the documents described the Mangione Policy as involving two insureds, and requiring the death of both insureds in order for the benefit to be paid.  Upon seeing those circumstances, which was contrary to the criteria that Giger had given Defendant Ahmann, Giger informed Defendant Ahmann that he would not invest in that type of policy. To remove Giger's concerns, Defendant Ahmann represented to Giger that the wife under the Mangione Policy had already passed away. Ahmann also stated that when Mr. Mangione, the remaining insured, presented his medical condition to A&O, it was determined he would likely pass away prior to term of the bond. Defendant Ahmann, however, failed to reveal to Giger that A&O never purchased this policy from the insured, so that the meeting could not have taken place (*See* Exhibit 9 attached hereto). When Giger inquired about the life expectancy review of Mr. Mangione conducted by Midwest

11

Medical Review, Ahmann stated that A&O was successfully sued by an owner of a policy to prevent further disclosures of personal health information.

38.  At this meeting Defendant Ahmann also presented a "Subscription Agreement" from Defendant A&O Life Fund, that Defendant Ahmann filled out, which Giger and Defendant Ahmann signed, but which was never signed by the offering entity and, in retrospect, appears to have had nothing to do with this second investment whatsoever. (*See* Exhibit 10 hereto).

39.  At or before this meeting on September 5, 2007, Defendant Ahmann again represented that he had done due diligence on these investments, and further that James Hintz, one of the principals of the company Ahmann now worked for, Pavek, had actually travelled to PCI's headquarters in Costa Rica for one week, met with PCI personnel, and completed his own due diligence to ensure the safety of these investments.

40.  Defendant Ahmann again reiterated, as he had with the First Investments, that all of the premiums as to this Mangione Policy would be paid to the end of the term, as would be the payment to PCI to obtain the bonding protection. Defendant Ahmann further reiterated that PCI was rated 5A by Dunn and Bradstreet, and that only "A" rated insurance policies are offered.

41.  Before this second investment, Defendant Ahmann also represented to Giger that Defendant Ahmann had sold over $10,000,000 in these life settlement investments. When Giger inquired that if this was such a good investment, how much had Defendant Ahmann invested, Defendant Ahmann stated that he had $130,000 of his own money invested.

42.  Based upon these representations and the representations made by Defendant Ahmann for the First Investments, Giger wrote a check for $1.1 million to A&O Life Fund, LLC as an owner/investor in the Mangione Policy (the "*Second Investment*").

12

**C.** **CLAIMANT BEGINS TO RECEIVE ALARMING INFORMATION RENDERING DEFENDANT AHMANN'S STATEMENTS FALSE AND MISLEADING AS TO THE FIRST INVESTMENTS**

43. On or about January 31, 2008, the Texas State Board of Securities sent out an inquiry to, *inter alia*, Giger, concerning PCI, the bonding company which was a major integral part of the First and Second Investments. A copy of that written inquiry is attached hereto as Exhibit 11. In corresponding with the Texas State Securities Board enforcement attorney, David Grauer, Giger was furnished with a Cease and Desist Order issued to PCI, attached hereto as Exhibit 12, and related to similar bonded life settlements as sold to Giger and bonded by PCI.

44. Among other things, the Cease and Desist Order related that PCI and an affiliated individual, Harold Maridon ("*Maridon*"), had not been registered with the Texas State Board of Securities nor otherwise been qualified in the State of Texas to offer and sell bonding related to life settlement contracts, that Maridon was convicted of conspiracy to commit mail and wire fraud in a case arising in 1997, and that the State of Florida had obtained a receivership and injunctive relief against PCI and a warrant issued for Maridon's arrest, arising from a 1993 lawsuit in Florida. According to Dunn and Bradstreet, as of August of 2007, public records show Maridon as a Senior Underwriter at PCL (*See* Exhibit 13 hereto).

45. This Texas Cease and Desist Order also disclosed that in connection with selling the bonded life settlement contracts, the Texas Department of Insurance had previously issued a separate Cease and Desist Order on November 6, 2006, ordering PCI to discontinue engaging in the unauthorized business of insurance in Texas. (*See* Exhibit 14 hereto). This Cease and Desist Order specifically named PCI (the re-insurer for all Giger's investments) against which the emergency cease and desist order was brought, and also the officers of A&O Resource Management, LTD (from whom Giger purchased all his investments), and the managers of Houston Tanglewood Partners, LLC (who holds the promissory notes for Giger's First Investments, and is a co-owner with Giger for his Second Investment).

13

46.     After receiving this information, Giger became concerned about the other representations made by Defendants Ahmann and Lange as to the First Investments. To add to Giger's concerns, in March, 2008, Giger received a premium payment notice from the insurance company that issued the Mangione Policy, West Coast Life Insurance Company, reflecting that a $42,812.50 premium was due on the Mangione Policy, which was directly in conflict with what Defendant Ahmann had told Giger, and what was represented in writing as to the First and Second Investments, *i.e.* that all of the premiums due for the life insurance policy in question would be prepaid from investor monies. (*See* Exhibit 15 hereto) Giger then contacted West Coast Life Insurance and was further advised that not only were the premiums for the Mangione Policy not paid in advance, but at the time of Giger's purchase in September, 2007, A&O, who Giger was told the premium notices were to be sent to, was already six (6) months in arrears and remained so as of March 6, 2009, as reflected by Exhibit 16 attached hereto. In fact, only one premium payment has been made from and after Giger's investment in September, 2007, which was paid by A&O in February, 2008, and that sole payment was for the quarterly premium due back in June, 2007. Thereafter, no quarterly premium payments have been made that were due in September and December 2007, or the premium payments due in March, June, September, and December 2008, and March, 2009. Giger has also come to learn that if no further premiums are received, the Mangione Policy will lapse on December 4, 2009 (*See* Exhibit 17 hereto), which is more than two (2) years before PCI would be contractually required to pay off the Mangione Policy pursuant to its bonding agreement. Making matters worse, without the return of the cash value of the Mangione Policy, the premiums are now more than $30,000 per month (more than double the planned premium) to maintain the policy. The lack of premium payment is taking the policy to the verge of default. (*See* Exhibit 17)

14

47. Upon further investigation, Giger also subsequently came to learn that A&O used Midwest Medical Review, LLC (*"Midwest Medical"*) for the certification/verification of life expectancy for each of the Policies issued in connection with the First Investments (*See* Exhibit 18 hereto), but that the Sacramento, California office of the Securities and Exchange Commission had filed suit against individuals and entities offering similar life settlement investments who also utilized the services of Midwest Medical, wherein the SEC alleged, *inter alia*, that Midwest Medical is owned and operated by George Kindness, a convicted felon, as reflected by Exhibit 19 hereto.

48. In this same lawsuit brought by the SEC, PCI is identified as a dubious and unlicensed bonding company, who has never been licensed to conduct insurance business anywhere in the United States. (*See* Exhibit 19, pages 9 & 10).

49. Further, in that same lawsuit the SEC had a receiver appointed, Michael Quilling, who has reported that in the case of the bonding issued by PCI for life settlement contracts involved in that case, PCI has defaulted on all of its six (6) policies that it issued in California, claiming they are "not active". (*See* Exhibit 20 attached hereto).

50. Giger further came to learn that on December 21, 2007, the Illinois Department of Securities issued a Temporary Order of Prohibition against A&O and affiliates, wherein it was also disclosed that the National Accounts Director for A&O, Adley Wahab, the same individual who made the written representations as to the First Investments sold to Giger, had been charged with the felony of forgery of a financial instrument in the State of Texas in April, 2004, and had been sentenced to five years of probation, and was on probation at the time he was offering for sale and sold products on behalf of A&O. (*See* Exhibit 21 attached hereto) In that regard, Giger has further come to learn that the United States Securities and Exchange Commission (*"SEC"*) has also charged Wahab with fraudulently offering securities to elderly investors. (*See* Exhibit __

15

attached hereto). Wahab has claimed his Fifth Amendment rights in an attempt to prevent the SEC from deposing him in this proceeding. (*See* Exhibit 23 attached hereto). Wahab is also one of the two members of A&O Life Fund, LLC from whom Giger purchased the Second Investment. The other member is "A&O Life Fund Management, LLC", whose only member in turn is Russell Mackert (*"Mackert"*), an attorney with offices in Belaire, Texas. Mackert in turn has claimed attorney/client privilege during his deposition before the SEC in the Wahab matter where Wahab has invoked the Fifth Amendment. Accordingly, Wahab was aware that the SEC was investigating him by the summer of 2007, which was prior to Giger's Second Investment. In addition, in the three months following Giger's Second Investment, Wahab transferred $12.6 million to Mackert's client trust fund account, which the SEC has claimed in its proceeding against Wahab was an attempt to prevent the discovery of those assets. (*See* Exhibit 24 hereto).

51.     Giger has also recently come to learn that A&O has settled with the Illinois Department of Securities, acknowledging the sale of unregistered securities, and has been fined for such activity. (*See* Exhibit 25 hereto) Since the payment of this fine, the SEC has requested a freeze of all accounts related to Wahab, including any remaining amount of the $12.6 million transferred to Mackert's client trust fund account (*See* Exhibit 26 attached hereto). According to Vernon Jones, the SEC receiver appointed in regard to the SEC charge of fraud set forth in paragraph 50 above, approximately six hundred dollars remains in the trust account.

52.     Giger also recently discovered that Houston TangleWood, who is the owner of the Policies purchased with use of Giger's funds provided as part of the First Investments, had its corporate charter forfeited in Texas in July, 2008. (*See* Exhibit 27 hereto.) To date, Giger has received no formal notice of any transfer of ownership or other report from Houston TangleWood that would possibly explain why its corporate charter has been forfeited.

53.    Giger has also come to learn that the Dunn & Bradstreet financial rating was based on uncontrolled and unverified data, and that PCI did not at the time and does not insure all Hyundai cars imported to the United States, as previously represented by Defendants Ahmann and Lange. (*See* Exhibit 13 attached hereto).

54.    In the face of these and other concerns, in or about January, 2008, Giger demanded that Defendant Ahmann produce the bonding agreement that PCI had executed in regard to the Mangione Policy. However, when Defendant Ahmann finally produced same, it was obviously not effective in that it was dated September 29, 2006, almost a year before Giger had even entered into the Second Investment. (*See* Exhibit 28 hereto)  When Giger pointed out this obvious discrepancy to Defendant Ahmann, Defendant Ahmann simply said a mistake had been made, and that he would get another bonding agreement re-issued with the proper date. However, to date no such agreement has been produced.

55.    Giger has also now come to learn that the second named insured individual on the Mangione Policy had not passed away prior to his purchase, as Defendant Ahmann falsely represented to Giger prior to the Second Investment.

56.    Giger has further recently discovered that the "Server" policy, which was a $600,000 investment as part of his First Investments on April 12, 2006, was a "Wet Paper" policy (sold while the ink was still wet), in that according to the records sent to Giger by Houston Tanglewood Partners at the end of February, 2009, the policy purchase date was April 1, 2006. (*See* Exhibit 29 hereto) Being a "Wet Policy", this policy could have been contested in its first two years, since in the first two years of a life insurance policy is considered the "contestable period". If an insured dies in that first two years, the insurance company has the right to deny the claim on the basis of a lack of an "insurable interest" or omissions of medical conditions in the application process.

57.    Finally, Giger has recently learned that the escrow company that held all the monies of the First Investments, Bayou City Escrow, Inc., appears to be a constantly changing, thinly organized entity:

    a.    whose name was changed two (2) months prior to Giger's First Investments, from "Spalding-Houston Properties Inc.", to "Bayou City Escrow, Inc." on or about February 15, 2006;

    b.    whose address and suite for the escrow company was that of a law firm, where a "John Spalding" was a senior partner;

    c.    that the identified "senior escrow officer", Laura Spalding, who negotiated Giger's check for the First Investments, is presumably John Spalding's wife; and

    d.    that Bayou City Escrow, Inc. then itself subsequently changed its name to "First Houston Trust, Inc." on October 30, 2007, and then "First Houston, Inc." on December 18, 2007. (*See* Exhibit 30 attached hereto).

    e.    Defendant Ahmann alleged that John Spalding sold similar life settlement investments as Consolidated Wealth Management, LLC, who has filed an exemption Section D with SEC to sell securities.

## D.    GIGER GIVES NOTICE OF RESCISSION AND DEMAND FOR RETURN OF HIS INVESTMENTS

58.    After receiving the above information, Giger, on or about first week in February 2008, at first informally requested that Defendants Ahmann and Pavek return Giger's First and Second Investments. Defendant Ahmann told Giger that such was not possible, but that others he was working with might be able to re-sell it through either an existing company or a new company to be formed. Giger informed Defendant Ahmann that he did not feel right to then be a part of re-selling something which was sold to Giger on what Giger believed was a fraudulent basis.

18

59. Defendant Ahmann did state that a principal of Pavek, a Mr. James Hintz, wanted to purchase and sell these bonded life settlements, but he could not find another reinsurance company to replace PCI.

60. Given the failure of Defendant Ahmann or Pavek to repurchase these investments, as first informally requested by Giger, on March 19, 2008 counsel for Giger formally gave notice of rescission and demand for a return of Giger's investments to Defendant Ahmann, Defendant Lange, A&O (and its principals), Houston TangleWood (and its principals), and Pavek, a copy of which is attached hereto as Exhibit 31. To date, this request for the return of Giger's First and Second Investments have been refused.

## E. FILING OF FINRA CLAIM AS TO SECOND INVESTMENT

61. In or about January, 2009, Giger, pursuant to an arbitration clause contained in the account agreement executed with Pavek as to the Second Investment, initiated an arbitration proceeding ("*FINRA Arbitration*") against Defendant Ahmann and Pavek, seeking rescission and damages as to the Second Investment. Said FINRA Arbitration as to the Second Investment remains pending and relief as to the Second Investment is not sought herein at this time as to Defendant Ahmann, or Pavek. However, the subsequent misrepresentations as to the Second Investment reflect Defendant Ahmann's continued pattern of misrepresentations and falsehoods as made with the First Investments, and therefore are material to the claims made herein as to the First Investments.

## COUNT I - VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT [15 U.S.C. §§ 78J(b)] AND SEC RULE 10b-5 [17 C.F.R. § 240.10b-5] PROMULGATED THEREUNDER

1-61. Giger realleges and incorporates by reference paragraphs 1 through 61 as if set forth fully herein.

19

62.     Count I is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. 78j(b); and Securities and Exchange Act Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, against Defendants Ahmann and Lange.

63.     In violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5, Defendants Ahmann, Lange, JW Cole, and A&O Resource Management, LTD (through Houston Tanglewood Partners, LLC), in connection with the sale of the First Investments, directly or indirectly, by use of the means and instrumentalities of interstate commerce and of the mails, employed one or more devise, scheme or artifice to defraud; omitted to state one or more material facts to Giger necessary in order to make the statements made, in the light of the circumstances under which they were made, not false and misleading; and engaged in one or more act, practice, or course of business which operated as fraud and deceit upon Giger.

64.     Specifically, Defendants Ahmann and Lange directly, and Defendant JW Cole, through its agent Ahmann, and A&O intentionally or recklessly made the following misrepresentations, and/or failed to disclose the foregoing facts subsequently coming to light to Giger, as follows:

> a.    That A&O Resource Management failed to ever file a federal exemption D prior to the sale of securities for Giger's First Investments, and therefore sold unregistered securities.

> b.    That A&O Resource Management failed to register with the State of Illinois before its representatives, Defendants Ahmann and Lange, sold Giger his First Investments.

> c.    That A&O Life Fund admitted to "cold calling" in the State of Illinois (*see* Exhibit 25 hereto). Cold calling constitutes a general solicitation.

20

d.   That the State of Texas Department of Insurance had obtained a Cease and Desist Order in November, 2006 against PCI, which any ordinary investor would have found this as material, yet was not disclosed.

e.   That PCI was not registered to do business anywhere in the U.S., and an affiliated person had been convicted of conspiring to commit mail and wire fraud in 1997, and that PCI was the subject of a receivership and injunctive relief obtained by the State of Florida.

f.   That not all of the premiums due for the life expectancy of the insured would be pre-paid, in full, using investor monies, as had been represented by Defendants.

g.   That the owners of A&O had little or no experience in life settlements and never worked in the institutional market for resale of life settlements to banks and hedge funds.

h.   That Midwest Medical Review, LLC was owned and operated by a convicted felon, according to the SEC's Sacramento Division.

i.   That the SEC considered PCI to be a dubious and unlicensed bonding company.

j.   That PCI did not insure all imported Hyundai automobiles.

k.   That Bayou City Escrow was not an established escrow company.

l.   That the Server policy was a "Wet Paper" policy, and that Giger was never explained the risks associated with a Wet Paper policy.

m.   That the premiums for the Mangione policy were 6 months in arrears at the time of Giger's purchase.

21

n.  That A&O had not paid the premiums on the Mangione policy to the term date and continues to fail to pay the premium, such that the policy will default if no premiums are received by December, 2009.

65.  Defendants' material misrepresentations and/or failure to disclose these material facts rendered Defendants representations in this regard false and misleading.

66.  Defendants' material misrepresentations and/or failure to disclose these material facts rendered the offering of these documents presented to Giger false and misleading.

67.  Defendant JW Cole is also responsible directly for these misrepresentations and omissions made by Defendant Ahmann, and the damages suffered by Giger, pursuant to its knowledge of the activities of its Registered Representative, Defendant Ahmann, and by virtue of its failure to properly supervise Defendant Ahmann and maintain internal supervisory control of Ahmann, as required by NASD Rules related to the supervision of its employees and affiliated Registered Representatives.

68.  Each of the material misrepresentations and/or omissions of fact alleged above was material.  Giger considered, and any similarly situated reasonable person or entity would have considered, the facts as set forth above to be of material importance in deciding whether to consummate the First Investments.

69.  Giger would not have agreed to purchase the First Investments if he had known of the facts as set forth above.

70.  Defendants knew or recklessly disregarded the facts as set forth in paragraph 53 above.

71.  Defendants knew or should have known that Giger would rely on the false and misleading statements described above when he decided whether to invest in the First Investments.

72.    In truth and in fact, Giger did in fact rely on these false and misleading statements in connection with investing in the First Investments.

73.    Defendants also had motive and opportunity to make these false and misleading statements, by receiving income from the sale of the First Investments.

74.    Defendants had a duty to state and disclose all material facts necessary to make the statements made, in light of the circumstances in which they were made, not false and misleading statements. Defendants failed to do so. As a result, Giger relied on these false and misleading statements and purchased the First Investments.

75.    As a direct and proximate result of Defendants' direct and indirect omissions of material fact, on which Giger reasonably relied and for which reliance is presumed, Giger has been injured in his business and property in an amount in excess of $1 Million.

WHEREFORE, Dr. Charles Giger, respectfully prays for entry of judgment in his favor and against Defendants James Ahmann, Gary Lange, JW Cole Financial, Inc., Adley Abdulwahab, A&O Resource Management, Ltd., and A&O Life Fund, LLC:

(a)    awarding Giger damages in an amount in excess of $1 Million;

(b)    awarding Giger consequential damages, including but not limited to, the costs together with the reasonable attorneys' fees and expenses incurred by Giger as a result of prosecuting this action; and

(c)    awarding Giger such other and further relief as the Court deems just and equitable.

## COUNT II - UOMMON LAW FRAUD AS TO FIRST INVESTMENTS

1-75.    For Count II of Giger's Complaint, Giger incorporates herein paragraphs 1 through 75 above.

23

76. The affirmative misrepresentations of material fact by Defendants Ahmann, Lange and JW Cole as described above as to the First Investments, and their failure to disclose certain other material facts as identified above, constitute common law fraud under Illinois law.

77. Giger relied to his detriment on the affirmative misrepresentations and omissions as outlined above, and would not have made the First Investments if the true facts were made known to Giger.

78. Giger has been damaged by Defendants' wrongful conduct as to the First Investments in the form of lost principal, interest/return on investment, costs and fees.

79. Defendant JW Cole is also responsible directly for these misrepresentations and omissions made by Defendant Ahmann, and the damages suffered by Giger, pursuant to its knowledge of the activities of its Registered Representative, Ahmann, and by virtue of its failure to properly supervise Ahmann and maintain internal supervisory control of Ahmann, as required by NASD Rules related to the supervision of its employees and affiliated Registered Representatives.

80. Based upon this fraud, Giger is entitled to a rescission of his First Investments from Defendants, as well as a return of his principal, interest/return on investment, and costs and fees.

**WHEREFORE**, Dr. Charles Giger prays that as to Count II of his Complaint, his purchase of the First Investments be rescinded as and against Defendants James Ahmann, Gary Lange, JW Cole Financial, Inc., Adley Abdulwahab A&O Resource Management, Ltd., and A&O Life Fund, LLC, based upon the foregoing, that he will be awarded such other damages to which he may be entitled to, plus attorneys' fees, expenses and costs and such other and further relief as deemed appropriate, together with appropriate punitive damages commensurate with the egregious behavior alleged above, all as against Defendants.

24

## COUNT III - VIOLATION OF ILLINOIS SECURITIES LAW OF 1953

1-80.    For Count III of Giger's Complaint, Giger incorporates herein paragraphs 1 through 80 above.

81.    Defendants sale of the First Investments to Giger constituted the sale of "securities" for purposes of Section 2.1 of the Illinois Securities Law of 1953.

82.    During the course of the sale of the First Investments, Defendants Ahmann, Lange and JW Cole through its agent, Ahmann, made statements of material fact as alleged above which were in fact untrue, and which Defendants knew were untrue.

83.    These representations and omissions were made with the intent that Giger rely thereon in determining whether to make the First Investments.

84.    Giger did in fact reasonably rely upon the honesty and truthfulness of the foregoing statements and omissions in deciding to make the First Investments.

85.    The foregoing representations and omissions were materially false and misleading.

86.    Giger has demanded that Defendants pay him the consideration he paid for the First Investments, but Defendants have refused same.

87.    Giger has suffered rescission damages and costs and expense as a result of Defendants' actions.

88.    Defendants' misconduct as set forth above constitutes a violation of the Illinois Securities Law of 1953.  Section 12 thereof finds the following acts to be violative of the Illinois Securities Law:

*    *    *    *    *

F.    to engage in any transaction, practice or course of business in connection with the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser or seller thereof.

25

G.     To obtain money or property through the sale of securities by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstance under which they were made, not misleading.

\*     \*     \*     \*     \*

I.     To employ any device, scheme or artifice to defraud in connection with the sale or purchase of any security, directly or indirectly.

89.     Defendant JW Cole is also responsible directly for these misrepresentations and omissions made by Ahmann, and the damages suffered by Giger, pursuant to its knowledge of the activities of its Registered Representative, Ahmann, and by virtue of its failure to properly supervise Ahmann and maintain internal supervisory control of Ahmann, as required by NASD Rules rela3ted to the supervision of its employees and affiliated Registered Representatives.

90.     Pursuant to Section 13 of the Securities Law, Giger is entitled to rescind his purchase of the First Investments from Defendants, and he is entitled to other relief as provided thereunder.

**WHEREFORE**, Dr. Charles Giger prays that as to Count III of his Complaint, his purchase of the First Investments be rescinded as and against Defendants based upon violation of the Illinois Securities Law, that he will be awarded such damages to which he may be entitled, plus attorneys' fees, expenses and costs and such  other and further relief as deemed appropriate, together with appropriate punitive damages commensurate with the egregious behavior alleged above, all as against Defendants James Ahmann, Gary Lange, JW Cole Financial, Ltd., Adley Abdulwahab, A&O Resource Management, Ltd., and A&O Life Fund, LLC.

## COUNT IV - CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT

1-90.     For Count IV of Giger's Complaint, Giger incorporates herein paragraphs 1 through 90 above.

91.   Defendants' actions, misrepresentations and omissions were willful and performed with malice, evil motive, and reckless indifference to the rights of Giger.

92.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (the "*Fraud Act*"), 815 ILCS 510/2, states as follows:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any persons has in fact been misled, deceived or damaged thereby....

93.   Section 10a of the Fraud Act, 815 ILCS 505/10a, further provides that:

> any person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual economic damages or any other relief which the court deems proper....

94.   Defendants' acts and omissions as alleged above constitute violations of 815 ILCS 505/2.

95.   Defendant JW Cole is also responsible directly for these misrepresentations and omissions made by Defendant Ahmann, and the damages suffered by Giger, pursuant to its knowledge of the activities of its Registered Representative, Ahmann, and by virtue of its failure to properly supervise Ahmann and maintain internal supervisory control of Ahmann, as required by NASD Rules related to the supervision of its employees and affiliated Registered Representatives.

93.   Inasmuch as Giger has sustained actual damages as a result of Defendant Ahmann's violations of 815 ILCS 505/2, he is entitled to economic damages, and attorneys' fees, pursuant to 815 ILCS 505/10a.

**WHEREFORE**, Dr. Charles Giger prays as to Count IV of his Complaint for judgment against Defendants for violation of the Fraud Act, in an amount equal to all economic damages, costs and expenses, including reasonable attorneys' fees incurred by him and resulting from said fraudulent and deceptive business practices, in violation of 815 ILCS 505/2, together with appropriate punitive damages commensurate with the egregious behavior alleged above, all as against Defendants James Ahmann, Gary Lange, JW Cole Financial, Inc., Adley Abdulwahab, A&O Resource Management, Ltd., and A&O Life Fund, LLC.

**JURY DEMAND**

PLAINTIFF demands trial by jury.

Respectfully submitted,

DR. CHARLES GIGER

By: ____ /s/ David T.B. Audley _____
                    One of His Attorneys

David T.B. Audley
Carly M. Jones
Chapman and Cutler LLP
111 West Monroe Street
Chicago, Illinois 60603
312 845-3000

## LINE OF CREDIT LOAN AGREEMENT

**Account Holder:**     Charles C. Giger

This agreement is made this 13th day of April, 2006 by and between Houston Tanglewood Partners, LLC ("Tanglewood Partners") and the above-referenced account holder (hereinafter "Account Holder.

Whereas, Account Holder has agreed to make available a line of credit to facilitate the loan of money, by and through the referenced account, to Tanglewood Partners (the "Loan");

Whereas, Tanglewood Partners has agreed to issue a line of credit promissory note to document the Loan which provides for repayment of principal and interest as indicated below. Tanglewood Partners has also agreed that neither the principal nor the interest on the principal may be prepaid in whole or in part;

Whereas Tanglewood Partners intends to use the proceeds of the Loan in its principal business, namely the identification, qualification, and purchase of discounted life insurance policies (or a percentage thereof) for terminally ill or senior persons and bonds insuring the payment of the related death benefit;

Whereas, by way of a separate security agreement, Tanglewood Partners agrees to provide Account Holder a security interest in any policies and bonds (and proceeds of either) acquired with the proceeds of the Loan;

Whereas, Account Holder desires and directs to acquire a line of credit note issued by Tanglewood Partners and secured by the policies and the bonds; and

Whereas Account Holder has reviewed and approved policy identified below to be purchased by Tanglewood Partners and pledged as security for the Loan;

Now therefore, in consideration of mutual covenants herein, the parties agree as follows:

LINE OF CREDIT LOAN AGREEMENT
© Copyright 2005 Houston Tanglewood Partners, LLC – All rights reserved

## Loan Terms

. Account Holder agrees to make available to Tanglewood Partners a line of credit up to a maximum sum of One Million Eighty Seven Thousand Seven Hundred Ninety Two Dollars and 00/100 ($1,087,792.00) for the purpose of acquiring policies and bonds in the ordinary course of Tanglewood Partner's business.

The Loan shall be documented in the form of a line of credit note bearing interest at the rate of twelve percent (12%) per annum (the "Note"). Account Holder authorizes Tanglewood Partners to make an initial draw in the amount of) Six Hundred Thousand Dollars and 00/100 ($600,000.00) (the "Initial Draw") and will fund the Initial Draw by wire transfer to the Escrow Account as defined below.

The Initial Draw shall be deposited in the Escrow Account identified below. Escrow instructions will be provided to the Escrow Agent directing that the funds from the Initial Draw be used to: (1) purchase the policy interest identified below; (2) pay the bond premium required to bond the policy and (3) pay the premiums for the life of the bond. Any excess from the Initial Draw shall then be released to Tanglewood Partners to cover its fees and costs related to the transaction. Tanglewood Partners makes no representations as to the specific net amount that will be required to purchase the policy, nor the specific fees assessed by Tanglewood Partners, or any specific supporting entity, including reviewing physicians, laboratories, attorneys, licensees, and consultants, as well as legal and escrow costs.

Future draws are not anticipated, but are authorized for, among other things, maintenance of the collateral securing the Note and shall be initiated by written instruction from Tanglewood Partners.

THE NOTE SHALL BE NON-RECOURSE AS TO TANGLEWOOD PARTNERS AND SECURED BY AND PAYABLE ONLY FROM THE PROCEEDS OF THE COLLATERAL AS DEFINED BELOW.

## Collateral

The Collateral shall consist of all of Tanglewood Partner's interest in accounts, negotiable interests, commercial paper and general intangibles held in the Escrow Account identified below and all supporting obligations and proceeds of any property held in the Escrow Account. Specifically the Collateral, by and through the Escrow Account, shall include the following interest:

LINE OF CREDIT LOAN AGREEMENT
8 Copyright 2005 Houston Tanglewood Partners, LLC – All rights reserved

Page 2 of 5

A 54.3946% interest in policy number JG5462406 issued by Jefferson Pilot (the "Policy").

<u>Escrow Account</u>
Account # 04-06-09
FBO Houston Tanglewood Partners, LLC (the "Escrow Account")

Bayou City Escrow, Inc.
attn: Laura Spalding
910 Travis Suite 1700
Houston, TX 77002
713-860-0507
<u>Wiring Instructions:</u>
Bayou City Escrow, Inc.
J.P. Morgan Chase Bank, N.A.
910 Travis
1st. Floor
Houston, TX 77002
ABA Rt# 111000614
Account # 2332855911

Affirmative Representations and Warranties of Account Holder

1.      Account Holder represents and warrants that:

(a)      Account Holder's net worth (either individually or with his or her spouse, if any), including homes(s), investments and all property and other assets, is in excess $1,000,000.00.

(b)     Account Holder's individual annual income was in excess of $200,000.00 in each of the two most recent years preceding this agreement and Account Holder expects at least $200,000.00 in income in the current year; or

(c)     Account Holder's annual income, jointly with his or her spouse, if any, was in excess of $300,000.00 in each of the two most recent years preceding this agreement and Account Holder expects at least $300,000.00 in income in the current year.

2.      Account Holder further represents and warrants that Account Holder has carefully examined his or her financial resources, investment objectives, and tolerance for risk. After conducting this examination and reviewing the terms of this agreement, Account Holder has determined that the Loan is appropriate for Account Holder's investments objectives.

LINE OF CREDIT LOAN AGREEMENT
© Copyright 2005 Houston Tanglewood Partners, LLC – All rights reserved

Page 3 of 5

3.   Account Holder further represents and warrants that Account Holder sufficiently understands the risk factors and objectives associated with the Loan either through independent analysis or as explained by one or more professional, trusted financial advisors and/or attorneys not affiliated with or in any way associated with or compensated by Houston Tanglewood Partners, LLC or its affiliates.

4.   Account Holder further represents and warrants that:

(a)   Account Holder has adequate means of providing for his or her current financial needs and personal contingencies;

(b)   Account Holder has no need for liquidity in the Loan and Account Holder is able to bear the financial risk of lending the funds described in this agreement for an indefinite period of time.

5.   Account Holder represents and warrants that he or she will maintain the confidentiality of all medical and insurance information received in connection with Tanglewood Partners's purchase of the Policy.

6.   Account Holder represents and warrants that he or she understands and agrees that the Note, and the Collateral, is of a "buy and hold" nature, there is no guaranteed liquidity for the Note or the Collateral and that Tanglewood Partners offers no buy back guarantee or assurance that Account Holder, in the event he or she forecloses on the Collateral prior to maturity of the Note, will be able to sell the Collateral or that Account Holder will be able to receive any set amount in the event of such sale. Further, Account Holder understands and agrees that in the event that it seizes the Collateral prior to the Escrow Account receiving the proceeds of the Policy, it may be subject to tax consequences pursuant to the Internal Revenue Code, including, but not limited to section 408 thereof. Account Holder hereby warrants and represents that it has and it will consult its own attorneys and tax advisers with respect to the consequences of its actions in entering into this agreement and exercising its rights pursuant to this agreement and related documents.

7.   Account Holder represents and warrants that he or she has reviewed and approved the Policy to be purchased by Tanglewood Partners and pledged as security for the Loan.

LINE OF CREDIT LOAN AGREEMENT
© Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

Page 4 of 5

8.   Account Holder represents and warrants that Account Holder has not relied on any statements, representations or warranties, whether verbal or in writing, made by Houston Tanglewood Partners, LLC, its agents, attorney's, and/or advisers with respect to Account Holder's decision to enter into this agreement or loan the funds identified herein

9.   Finally, Account Holder represents and warrants that the information contained herein is complete and accurate and may be relied on by Houston Tanglewood Partners, LLC.  Account Holder also agrees to notify Houston Tanglewood Partners LLC, of any change in any of the information contained herein prior to lending the money described herein.

### Arbitration

The parties agree that, all claims, disputes, controversies, differences or other matters in question arising out of the relationship between Account Holder and Houston Tanglewood Partners LLC (and its officers, directors and/or employees), whether related to this agreement or otherwise shall be settled finally, completely and conclusively by arbitration in Houston, Harris County, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "Rules"), by one or more arbitrators chosen in accordance with the Rules. Arbitration shall be initiated by written demand of the party seeking arbitration. A decision of the arbitrator or arbitrators shall be final, conclusive and binding on the parties and judgment may be entered thereon in the District Court of Harris County, Texas, to enforce such decision and the benefits thereof. Any arbitration held in accordance with this paragraph shall be private and confidential and no person shall be entitled to attend the hearings except the arbitrator(s), the stenographer, if one is requested, each party, attorneys for each party and/or any representative designated by each party. The matters submitted for arbitration, the hearings and proceedings thereunder and the arbitration award shall be kept and maintained in strictest confidence and shall not be discussed, disclosed or communicated to any persons. On request of either party, the record of the proceeding shall be sealed and may not be disclosed except insofar, and only insofar, as may be necessary to enforce the award of the arbitrators and any judgment enforcing such award. The prevailing party shall be entitled to recover reasonable and necessary attorneys' fees and costs from the non-prevailing party.

---

Charles C. Giger

Houston Tanglewood Partners, LLC

Chris M. Allmendinger
Vice President

LINE OF CREDIT LOAN AGREEMENT
8 Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved.

## LINE OF CREDIT PROMISSORY NOTE

$1,087,792.00
April 13, 2006

FOR VALUE RECEIVED, the undersigned, Houston Tanglewood Partners, LLC, a Texas
limited liability company ("Maker") hereby promises to pay to the order of:

Charles C. Giger
265 Claremont St.
Elmhurst, IL 60126
 ("Account Holder" or "Payee")

in lawful money of the United States of America, the principal sum of $1,087,792.00 ("Principal") or
as much as may be advanced or outstanding thereunder, together with interest on the outstanding
principal balance from day to day remaining as herein specified.

Principal may be borrowed hereunder from time to time. Any amounts borrowed shall accrue
interest as provided herein. This balance due on the Note, including accrued and unpaid interest,
may not be prepaid in whole or in part.

Terms of Repayment:  Principal and accrued and unpaid interest shall be due and payable at
the earlier to occur of:

(i) July 15, 2011; or

(ii) the receipt of funds into the escrow account identified as account number 04-06-09 held
by Bayou City Escrow, Inc. ("Escrow Agent") for benefit of Maker (the "Escrow Account") resulting
from any proceeds of: (1) insurance policy number JG5462406 issued by Jefferson Pilot or (2) from
a bond issued by Provident Capital Indemnity (the "Bond") bonding the Policy.

Security for Payment:  This note is secured by a security interest created in a security
agreement that is of even dated and executed by Houston Tanglewood Partners, LLC as the Maker in
favor of Payee as the secured party that covers the Escrow Account and all property and after-
acquired property held in the Escrow Account (the "Security Agreement").

The outstanding principal balance hereof shall bear interest prior to default or maturity at
rate per annum equal to twelve percent (12%).  After default or maturity, principal and past due
interest shall bear interest at the Default Rate (hereinafter defined), provided, however, that at no

© Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

time shall the outstanding principal balance plus accrued and unpaid interest exceed $1,087,792.00. Once the outstanding principal balance plus accrued and unpaid interest reaches $1,087,792.00 the interest rate shall reduce to zero percent (0%) for the remaining term of the Note, regardless whether an Event of Default exists.

Interest on the indebtedness evidenced by this Note shall be computed on the basis of a year of 360 days and the actual number of days elapsed (including the first day but excluding the last day) unless such calculation would result in a usurious rate, in which case interest shall be calculated on the basis of a year of 365 or 366 days, as the case may be.

As used in this Note, the following terms shall have the respective meanings indicated below:

"Default Rate" means the rate per annum equal to the lesser of (i) the Wall Street Journal prime rate as quoted in the money rates section of the Wall Street Journal which is also the base rate on corporate loans at large United States money center commercial banks as its prime commercial or similar reference interest rate plus five percent, with adjustments to be made on the same date as any change in the rate and (ii) the Maximum Rate.

"Maximum Rate" means the maximum rate of non-usurious interest permitted from day to day by applicable law, including Texas Finance Code, Section 303.301 and as the same may be incorporated by reference in other Texas statutes, but otherwise without limitation, that rate based upon the "indicated rate ceiling" and calculated after taking into account any and all relevant fees, payments, and other charges in respect of this Note which are deemed to be interest under applicable law.

Notwithstanding anything to the contrary contained herein, no provisions of this Note shall require the payment or permit the collection of interest in excess of the Maximum Rate. If any excess of interest in such respect is herein provided for, or shall be adjudicated to be so provided, in this Note or otherwise in connection with this loan transaction, the provisions of this paragraph shall govern and prevail, and neither Maker nor the sureties, guarantors, successors, or assigns of Maker shall be obligated to pay the excess amount of such interest, or any other excess sum paid for the use, forbearance or detention of sums loaned pursuant hereto. If for any reason interest in excess of the Maximum Rate shall be deemed charged, required or permitted by any court of competent jurisdiction, any such excess shall be applied as a payment and reduction of the principal of indebtedness evidenced by this Note; and, if the principal amount hereof has been paid in full, any remaining excess shall forthwith be paid to Maker. In determining whether or not the interest paid or payable exceeds the Maximum Rate, Maker and Payee shall, to the extent permitted by applicable law, (i) characterize any non-principal payment as an expense, fee, or premium rather than as interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the entire

8 Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

contemplated term of the indebtedness evidenced by this Note so that the interest for the entire term does not exceed the Maximum Rate.

If default occurs in the payment of principal or interest under this Note, the holder hereof may, at its option, declare the entire unpaid principal of and accrued interest on this Note immediately due and payable without notice, demand or presentment, including, without limitation, notice of intention to accelerate, all of which are hereby waived, and upon such declaration, the same shall become and shall be immediately due and payable, and the holder hereof shall have the right to foreclose or otherwise enforce all liens or security interests securing payment hereof, including taking sole possession of the Escrow Account or any part thereof, and offset against this Note any sum or sums owed by the holder hereof to Maker. The failure to exercise the option to accelerate the maturity of this Note upon the happening of any one or more of the Events of Default as defined herein, shall not constitute a waiver of the right of the holder of this Note to exercise the same or any other option at that time or at any subsequent time with respect to such uncured default or any other event of default hereunder or under any instrument securing, governing, guaranteeing or evidenced by this Note. The remedies of the holder hereof, as provided in this Note and in any instrument securing, governing, guaranteeing or evidencing the loan evidenced hereby, shall be cumulative and concurrent and may be pursued separately, successively or together as often as occasion therefor shall arise, at the sole discretion of the holder hereof. The acceptance by the holder hereof of any payment under this Note which is less than the payment in full of all amounts due and payable at the time of such payment shall not (i) constitute waiver of or impair, reduce, release or extinguish any remedy of the holder hereof or the rights of the holder hereof to exercise the foregoing option or any other option granted to the holder or any other party in this Note or under any other instrument securing, governing, guaranteeing, or evidencing the loan evidenced hereby, at that time or at any subsequent time, or nullify any prior exercise of any such option, or (ii) impair, reduce, release, extinguish or adversely affect the obligations of any party liable under such documents as originally provided therein.

Events of Default:    A default exists under this Note if (1) (a) Maker or (b) any other person liable on any part of this Note or who grants a lien or security interest on property as security for any part of this Note (an "Other Obligated Party") fails to timely pay or perform any obligation or covenant in any written agreement between Payee and Maker or any Other Obligated Party; (2) any warranty, covenant, or representation in this Note or in any other written agreement between Payee and Maker or any Other Obligated Party is materially false when made; (3) a receiver is appointed for Maker, any Other Obligated Party, or any property on which a lien or security interest is created as security (the "Collateral Security") for any part of this Note; (4) any Collateral Security is assigned for the benefit of creditors; (5) a bankruptcy or insolvency proceeding is commenced by Maker or any Other Obligated Party; (6) (a) a bankruptcy or insolvency proceeding is commenced against Maker, or an Other Obligated Party and (b) the proceeding continues without dismissal for sixty days, the party against whom the proceeding is commenced admits the material allegations of the petition against it, or an order for relief is entered; (7) any of the following parties is dissolved,

begins to wind up its affairs, is authorized to dissolve or wind up its affairs by its governing body or persons, or any event occurs or condition exists that permits the dissolution or winding up of the affairs of any of the following parties: Maker or an Other Obligated Party; and (8) any Collateral Security is impaired by loss, theft, damage, levy and execution, issuance of an official writ or order of seizure, or destruction, unless it is promptly replaced with collateral security of like kind and quality or restored to its former condition.

NOTWITHSTANDING ANY OTHER PROVISION OF THIS NOTE, PAYEE MAY SATISFY THE DEBT EVIDENCED BY THIS NOTE ONLY BY THE ENFORCEMENT OF PAYEE'S RIGHTS IN THE PROPERTY HELD BY THE ESCROW ACCOUNT PURSUANT TO THE SECURITY AGREEMENT, AND MAKER WILL NOT BE LIABLE FOR A MONEY JUDGMENT IN THE EVENT OF A DEFAULT UNDER THIS NOTE OR THE SECURITY AGREEMENT.

If any provision of this Note conflicts with any provision of a loan agreement, deed of trust, or Security Agreement of the same transaction between Payee and Maker, the provisions of the Security Agreement will govern to the extent of the conflict.

This Note shall be governed by and construed in accordance with the laws of the State of Texas and the applicable laws of the United States of America. This Note is to be performed in Harris County, Texas.

Maker waives notice, presentment, demand for payment, protest, notice of protest and non-payment or dishonor, notice of acceleration, notice of intent to accelerate, notice of intent to demand, diligence in collecting, grace, and all other formalities of any kind, and consent to all extensions without notice for any period or periods of time and partial payments, before or after maturity, and any impairment of any collateral securing this Note, all without prejudice to the holder. The holder shall similarly have the right to deal in any way, at any time, with one or more of the foregoing parties without notice to any other party, and to grant any such party any extensions of time for payment of any of said indebtedness, or to release or substitute part or all of the collateral securing this Note, or to grant any other indulgences or forbearance whatsoever, without notice to any other party and without in any way affecting the personal liability of any party hereunder.

Payee agrees that, all claims, disputes, controversies, differences or other matters in question arising out of the relationship between Payee and Maker(and its officers, directors and/or employees), whether related to this Note or otherwise shall be settled finally, completely and conclusively by arbitration in Houston, Harris County, Texas, in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "Rules"), by one or more arbitrators chosen in accordance with the Rules. Arbitration shall be initiated by written demand of the party seeking arbitration. A decision of the arbitrator or arbitrators shall be final, conclusive and binding on the parties and judgment may be entered thereon in the District Court of Harris County, Texas, to

LINE OF CREDIT PROMISSORY NOTE                                                    Page 4 of 5
8 Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

enforce such decision and the benefits thereof. Any arbitration held in accordance with this paragraph shall be private and confidential and no person shall be entitled to attend the hearings except the arbitrator(s), the stenographer, if one is requested, each party, attorneys for each party and/or any representative designated by each party. The matters submitted for arbitration, the hearings and proceedings thereunder and the arbitration award shall be kept and maintained in strictest confidence and shall not be discussed, disclosed or communicated to any persons. On request of either party, the record of the proceeding shall be sealed and may not be disclosed except insofar, and only insofar, as may be necessary to enforce the award of the arbitrators and any judgment enforcing such award. The prevailing party shall be entitled to recover reasonable and necessary attorneys' fees and costs from the non-prevailing party.

NOTICE: THIS DOCUMENT AND ALL OTHER DOCUMENTS RELATING TO THE INDEBTEDNESS EVIDENCED BY THIS NOTICE CONSTITUTE A WRITTEN LOAN AGREEMENT WHICH REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

THERE ARE NO ORAL AGREEMENTS OF THE PARTIES RELATING TO THE INDEBTEDNESS EVIDENCED BY THIS NOTE.

Houston Tanglewood Partners, LLC

Chris M. Allmendinger
Vice President

## Security Agreement

**Date:**     April 13, 2006

**Debtor:**     Houston Tanglewood Partners, LLC, a Limited Liability Company

**Debtor's Mailing Address:**

        Houston Tanglewood Partners, LLC
        770 S. Post Oak Lane, Ste. 610
        Houston, TX 77056
        Harris County, Texas

**Secured Party:**

Charles C. Giger
265 Claremont St.
Elmhurst, IL 60126
 ("Account Holder" or "Payee")

**Classification of Collateral:**  Accounts and General Intangibles

**Collateral:**

        All of Debtor's interest in Escrow Account number 04-06-09 held by Bayou City Escrow, Inc., 910 Travis Suite 1700, Houston, TX 77002 for the benefit of Houston Tanglewood Partners, LLC and all supporting obligations and proceeds of any property held under such account.

**Obligation**

        Line of Credit Promissory Note

        Date:  April 13, 2006

        Original principal amount:  $1,087,792.00

        Borrower (Obligor):  Houston Tanglewood Partners, LLC

SECURITY AGREEMENT
8 Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

Page 1 of 8

Account Holder (Secured Party):

Charles C. Giger
265 Claremont St.
Elmhurst, IL 60126
("Account Holder" or "Payee")

Maturity date: July 15, 2011

Terms of Payment:    As provided in the note.

Other debt/Future advances: The security interest also secures future advances.

Debtor's Representations Concerning Debtor and Locations:

The collateral is located solely at Bayou City Escrow, Inc., 910 Travis Suite 1700, Houston, TX 77002

Debtor's, Houston Tanglewood Partners, LLC, place of business is located at 770 S. Post Oak Lane, Ste. 610 , Houston, TX 77056.

Debtor's, Houston Tanglewood Partners, LLC, state of organization is Texas; Debtor's name, as shown in its organizational documents, as amended, is exactly as set forth above; and Debtor's organizational identification number is 800501543

Debtor's records concerning the Collateral are located its place of business indicated above.

Debtor grants to Secured Party a security interest in the Collateral and all its proceeds to secure the Obligation and all renewals, modifications, and extensions of the Obligation. Debtor authorizes Secured Party to file a financing statement describing the Collateral.

A.    Debtor represents and warrants the following:

1.    No financing statement covering the Collateral is filed in any public office.

2.    Debtor owns the Collateral and has the authority to grant this security interest, free from any setoff, claim, restriction, security interest, or encumbrance except liens for taxes not yet due.

3.    All information about Debtor's financial condition is or will be accurate when provided to Secured Party.

SECURITY AGREEMENT                                             Page 2 of 8
© Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved

4.  Each account and chattel paper in the Collateral is and will be the valid, legally enforceable obligation of a third-party account debtor or obligor.

5.  If any Collateral or proceeds include obligations of third parties to Debtor, the transactions creating those obligations conform and will conform in all respects to applicable state and federal consumer credit law.

B.  Debtor agrees to

1.  Defend the Collateral against all claims adverse to Secured Party's interest; pay all taxes imposed on the Collateral; keep the Collateral free from liens, except for liens in favor of Secured Party or for taxes not yet due; and keep the Collateral in Debtor's possession and ownership except as otherwise provided in this agreement.

2.  Sign and deliver to Secured Party any documents or instruments that Secured Party considers necessary to obtain, maintain, and perfect this security interest in the Collateral.

3.  Notify Secured Party immediately of any event of default and of any material change (a) in the Collateral, (b) in Debtor's Mailing Address, (c) in the location of any Collateral, (d) in any other representation or warranty in this agreement, and (e) that may affect this security interest, and of any change (f) in Debtor's name and (g) of any location set forth above to another state.

4.  Use the Collateral primarily according to the stated classification.

5.  Maintain accurate records of the Collateral at the address set forth above, furnish Secured Party any requested information related to the Collateral; and permit Secured Party to inspect and copy all records relating to the Collateral.

6.  Preserve the liability of all obligors on the Collateral and preserve the priority of all security for the Collateral.

7.  On Secured Party's demand, hold payments, including instruments, items, and money received as proceeds of the Collateral, separate and in an express trust for Secured Party and deposit all such payments received as proceeds of the Collateral in a special bank account designated by Secured Party, who alone will have power of withdrawal.

C.  Debtor agrees not to

1.  Sell, transfer, or encumber any of the Collateral.

2.  Change its name or jurisdiction of organization, merge or consolidate with any person, or convert to a different entity without notifying Secured Party in advance

SECURITY AGREEMENT                                            Page 3 of 8
8 Copyright 2005 Houston Tanglewood Partners, LLC - All rights reserved