UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CHARLES GIGER,

          Plaintiff,

v.

JAMES AHMANN, GARY LANGE, ADLEY
ABDUL WAHAB, A&O RESOURCE
MANAGEMENT, LTD., AND A&O LIFE
FUND, LLC,

          Defendants.

No. 09 C 4060

Judge Thomas M. Durkin

## MEMORANDUM OPINION AND ORDER

Charles Giger alleges that James Ahmann and Gary Lange fraudulently sold him an investment product known as a "life settlement" in violation of federal and Illinois securities laws and Illinois anti-fraud laws. R. 165. Ahmann and Lange have each moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. R. 173; R. 176. For the following reasons, both of their motions are denied.

## Background

Giger was Ahmann's physician. R. 182 ¶ 18. Ahmann was an agent for J.W. Cole Financial, Inc. R. 24 ¶ 23. In March 2006, Ahmann approached Giger about investing in a life settlement product offered by A&O Resource Management in conjunction with Houston TangleWood Partners. R. 190 ¶¶ 19-20, 31; R. 24 ¶¶ 18, 27. "Life settlement" is a term used to describe the sale by an insured person to a third party of the right to pay premiums on and receive the death benefit of a life

insurance policy. R. 24 ¶¶ 12-13; R. 25 ¶¶ 12-13.[1] Ahmann told Giger that the life settlements would be secured by Provident Capital Indemnity ("PCI"), a bonding company that would pay the death benefit amount on the underlying life insurance policy in the event that the insured did not die within a certain period of time. R. 24 ¶ 19. An entity called Midwest Medical Review provided the life expectancy calculations. R. 190 ¶ 10.

On April 12, 2006, Ahmann and Lange met with Giger and his wife at Giger's house. Giger alleges that Ahmann told Giger that Lange was his partner and that Lange's involvement in the transaction was necessary because Lange was only one of twelve people in the country that could sell this investment. R. 190 ¶ 35; R. 186 ¶ 26. Giger and Lange signed documents enabling Giger to invest in three separate life insurance policies. R. 182 ¶¶ 26, 33-34. The three policies are identified by the last names of the insured people, namely Server, Frater and Boseker. R. 182 ¶¶ 36, 39-40. Giger authorized the following payments: (1) $600,000 for the Server policy on April 13, 2006, R. 183-8 at 70-75; (2) $199,542.17 for the Frater policy on May 3, 2006;[2] and (3) $199,542.17 for the Boseker policy on May 3, 2006, R. 183-8 at 77-85.

---

[1] The parties agree that "[l]ife settlements emerged in recent years as an offshoot of the viatical settlement industry which developed in the 1980s as a source of liquidity for HIV and AIDS patients and other terminally ill life insurance owners with life expectancies of less than two years. In contrast to viaticals, life settlements involve policyholders who are not terminally ill, but generally have a life expectancy of between two to fifteen years." R. 24 ¶ 12; R. 25 ¶ 12.

[2] *See* Exhibit 23 to Volume II of Plaintiff Charles Giger's Combined Appendix in Support of His Responses to Defendants' Statements of Material Fact, and Plaintiff's Statement of Additional Facts, dated Nov. 27, 2012. A hard copy of this exhibit was provided to the Court but not filed electronically.

In early 2008, Giger received a letter from the Texas Department of Securities concerning A&O. R. 183-7 at 15-18. This letter motivated Giger to do additional research regarding A&O and the other companies and individuals responsible for managing his life settlement investments. Giger discovered information that caused him great concern about the security of his investments, and on March 19, 2008, Giger had his lawyer send a letter to Ahmann, Lange, and representatives of A&O and Houston Tanglewood demanding rescission of the $2.1 million that Giger had invested with them. R. 183-8 at 6-10.[3] Giger alleges that this demand was refused. R. 165 ¶ 60.

Giger filed this case on July 7, 2009, alleging that Ahmann and Lange misrepresented and omitted material information in selling him the life settlements. Specifically, Giger alleges violations of § 10(b)(5) of the Exchange Act of 1934, Illinois Common Law, the Illinois Securities Laws of 1953, and the Illinois Consumer Fraud and Deceptive Business Practices Act.[4]

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all

---

[3] The $2.1 million includes investments in addition to those at issue in this case.

[4] Giger's claims against the A&O defendants are stayed due to a Chapter 11 bankruptcy filing. R. 50 at 5. Giger settled with former defendant J.W. Cole Financial Inc. R. 193. Defendant Adley Abdul Wahab has never appeared in the case.

of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

Ahmann argues the following in support of his motion for summary judgment:

(1) Giger's federal securities fraud claim does not comply with the applicable statute of limitations, R. 178 at 7-9;

(2) the life settlements are not securities for the purposes of federal or Illinois securities fraud statutes, R. 178 at 4-7;

(3) Ahmann did not make any misrepresentation or omission as to material facts, R. 178 at 9-11;

(4) Giger disclaimed any reliance on Ahmann's statements in the relevant deal documents, R. 178 at 11-12;

(5) a reasonable jury could not find that Giger relied on Ahmann's statements, R. 178 at 12-13;

(6) the Illinois Consumer Fraud Act does not apply in these circumstances, R. 178 at 17-18; and,

(7) Giger failed to preserve his claim under Illinois Securities Law, R. 178 at 14-17.

Lange seconds most of these arguments, and also argues that summary judgment in his favor should be granted because he had no duty to Giger and the rescission Giger seeks is not possible. *See* R. 174.

## I.  Whether Giger's Federal Securities Fraud Claim Complies with the Applicable Statute of Limitations.

Ahmann argues that Giger failed to bring his federal securities fraud claim within the two-year statute of limitations provided by 28 U.S.C. § 1658(b). Ahmann contends that Giger "was on inquiry notice of the alleged fraud at the time of the purchase" at Giger's house on April 12, 2006, because although Ahmann allegedly told him that the rate of return on the life settlements was "guaranteed," the documents stated the yield was "estimated." R. 178 at 7-8. Giger argues that he was not aware of the fraud until he received a communication from the Texas State Securities Board dated January, 29 2008. R. 183-7 at 15-18. If Ahmann is correct that the statute of limitations began to run on April 12, 2006, then Giger's filing of his complaint on July 7, 2009 does not comply with the two-year statute of limitations. If Giger is correct, however, that the statute of limitations did not begin to run until he received the Texas State Securities Board letter sometime after January 29, 2008, then his claim is timely.

As an initial matter, the Court notes that in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010), the Supreme Court clarified that "the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running of the limitations period. [Rather,] the limitations period in § 1658(b)(1) begins to run

once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first."

This legal clarification, however, is not necessary to explain why Ahmann's statute of limitations argument fails, because the discrepancy between Ahmann's alleged oral representations and the written representations in the deal documents was not enough to put Giger on inquiry notice of the fraud he alleges, let alone to constitute actual discovery of that fraud. Ahmann's argument implies that the discrepancy between Ahmann's oral representations about the life settlement product and the representations in the actual deal documents should have demonstrated to Giger that Ahmann and Lange were also lying about the solvency of A&O, PCI, and Midwest Medical, as well as the trustworthiness of the individuals running those companies. The provision in the deal documents Ahmann cites, however, does not create the suspicion he claims. The deal documents say that Giger "will realize an estimated annual compound yield of not less than 12%." R. 177-21 at 4. But Giger does not allege that he was defrauded because the rate of return on his investment was less than 12%. He alleges that he lost his entire investment because A&O, PCI and Midwest Medical were insolvent and managed by untrustworthy individuals. A discrepancy between the rate of return promised orally and in writing is not an obvious sign to a putative investor that the entire deal is bad, especially when Ahmann and Lange are simultaneously touting the attractiveness of the investment.

Moreover, Giger's conduct on the day he signed the deal documents shows that he was not blindly accepting what Ahmann told him. Giger alleges that he noticed that the written representations in the deal documents did not provide that the premiums on the underlying policy would be pre-paid as Ahmann had promised orally. R. 181 at 14. Giger requested additional written assurances that the premiums would be pre-paid, and Ahmann provided a letter from A&O dated May 31, 2006 promising that "A&O purchases the policy paying the premium to the end of the insured's life expectancy." R. 183-7 at 12-13; R. 183-2 at 162:23 – 164:3. With this evidence a reasonable jury could find that a reasonable person would not have discovered the fraud Giger alleges sooner than he did.

## II.     Whether Life Settlements Are Securities.

Both Ahmann and Lange argue that the bonded life settlements Giger purchased do not meet the definition of "securities" under federal law and Illinois law. R. 178 at 3-6; R. 174 at 14-15.

An "investment contract" is a type of security under both federal and Illinois law. 15 U.S.C. § 77b; 815 ILCS 5/2.1. And under both federal and Illinois law, "the test for determining whether a particular scheme is an investment contract" is "'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'" *S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) (quoting *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946)); *Ronnett v. Am. Breeding Herds, Inc.*, 464 N.E.2d 1201, 1203 (Ill. App. Ct. 1st Dist. 1984) (adopting *Howey*). This is "'a flexible rather than a static principle, one that is

capable of adaptation to meet the countless and various schemes devised by those who seek the use of the money of others on the promise of profits."' *Edwards*, 540 U.S. at 393 (quoting *Howey*, 328 U.S. at 299). Additionally, the Seventh Circuit has stated that the "[Exchange] Act's definition of 'security' seeks to confine the protection of the securities laws to investors and exclude from the Act's protection borrowers and lenders in commercial settings." *Secon Serv. Sys. v. St. Joseph Bank and Trust Co.*, 855 F.2d 406, 411 (7th Cir. 1988).

Ahmann argues that Giger cannot show that the life settlements were a "common enterprise." R. 178 at 5. But Ahmann admits that Giger owned only "a portion of the Boseker policy." R. 178 at 5. And there is evidence in the record that Giger owned only 54.3946% of the Server policy and 40.5179% of the Frater policy. *See* R. 177-24; R. 177-25. This evidence suggests that other investors owned a percentage of the policies in common with Giger. Thus, there is sufficient evidence in the record for a reasonable jury to find that the life settlements are a "common enterprise."

Ahmann also argues that the profits from Giger's life settlements did not "come solely from the efforts of others," as the Supreme Court's test requires. R. 178 at 6. Rather, Ahmann contends that "the only variable that could affect the profitability of the bonded life settlements was the death of the insured or the maturity of the bond. . . . [T]he PCI financial guaranty bond eliminated the 'maturity' or 'longevity' risk associated with A&O's purported ability to accurately measure an insured's life expectancy." R. 178 at 6. Thus, Ahmann argues this case

8

is unlike *S.E.C. v. Mutual Benefits Corp.*, 408 F.3d 737 (11th Cir. 2005), in which the Eleventh Circuit held that an unbonded life settlement investment is a security. Similarly, Lange argues that because Giger's "A&O investment paid out only when the insured died," and "A&O could do nothing to change the investment's value," Giger's case is analogous to *S.E.C. v. Life Partners*, 87 F.3d 536 (D.C. Cir. 1996), in which the D.C. Circuit held that a life settlement is not a security. R. 174 at 14.

The D.C. Circuit reached this decision because the promoter of the financial product at issue had no further responsibility for the profitability of the product after the investor purchased it. The D.C. Circuit reasoned that:

> the time of sale is [not] an artificial dividing line. It is a legal construct but a significant one. If the investor's profits depend thereafter predominantly upon the promoter's efforts, then the investor may benefit from the disclosure and other requirements of the federal securities laws. But if the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished. . . .
>     We see here no "venture" associated with the ownership of an insurance contract from which one's profit depends entirely upon the mortality of the insured . . . .

*Life Partners*, 87 F.3d at 547-48.

The Eleventh Circuit disagreed, however, holding that the Supreme Court does not "require such a clean distinction between a promoter's activities prior to his having use of an investor's money and his activities thereafter," but instead "directs [courts] to broadly apply the Security Acts . . . to all 'schemes devised by

9

those who seek the use of the money of others on the promise of profits.'" *Mutual Benefits*, 408 F.3d at 743 (quoting *Howey*, 328 U.S. at 299). The Eleventh Circuit reasoned that "[w]hile it may be true that the 'solely on the efforts of the promoter or a third party' prong of the *Howey* test is more easily satisfied by post-purchase activities, there is no basis for excluding pre-purchase managerial activities from the analysis." *Mutual Benefits*, 408 F.3d at 743.

Notably, outside of the life settlement context, courts have found that financial products constituted securities even when the promoter's activities were primarily pre-purchase. *See Bailey v. J.W.K. Props., Inc.*, 904 F.2d 918, 923-25 (4th Cir. 1990) (holding that a cattle breeding program constituted a security because the promoters' pre-investment selection of embryos and preparation for crossbreeding satisfied the *Howey* test); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1035 (2d Cir. 1974) (holding that a scheme to purchase Scotch whisky and casks constituted a security because the promoter's pre-investment selection of the whisky and casks satisfied the *Howey* test); *S.E.C. v. Brigadoon Scotch Distributors*, 388 F. Supp. 1288, 1291-93 (S.D.N.Y. 1975) (holding that a scheme to purchase rare coins constituted a security because the promoters' pre-investment selection of the coins satisfied the *Howey* test); *see generally* Florence Bih Shu-Acquaye and Elisabeth Divine Reid, *Viatical Settlement Industry: Does Mutual Benefits Render It Terminal?*, 7 Transactions: Tenn. J. Bus. L. 7 (Fall 2005).

Furthermore, several district courts have rejected the D.C. Circuit's reasoning in *Life Partners* and found that life settlements are securities. *See S.E.C. v. Secure Inv. Servs., Inc.*, 2009 WL 1459181, at *5 (E.D. Cal. May 26, 2009) (finding that a bonded life settlement constituted a security); *Wuliger v. Eberle*, 414 F. Supp. 2d 814, 819-24 (N.D. Ohio 2006) (finding that a life settlement constituted a security); *S.E.C. v. Tyler*, 2002 WL 32538418, at *4-6 (N.D. Tex. Feb. 21, 2002) (finding that a life settlement constituted a security).

Additionally, the fact that the life settlements Giger purchased were bonded does not change the Court's conclusion. Although the bond made the promoter's estimate of the insured's life expectancy less critical, that estimate was still a relevant factor in the value of the investment. Furthermore, as the Eleventh Circuit described, the promoter's various other efforts contributed to the profitability of the life settlement. The Eleventh Circuit stated,

> The investors' expectations of profits in this case relied heavily on the pre- and post-payment efforts of the promoters in making investments in viatical settlement contracts profitable. The investors selected the "term" of their investment, and submitted completed agreement forms and money. Thereafter, [the promoters] selected the insurance policies in which the investors' money would be placed. [The promoters] bid on policies and negotiated purchase prices with the insureds. [The promoters] determined how much money would be placed in escrow to cover payment of future premiums. . . . And, investors had no ability to assess the accuracy of representations being made by [the promoters] or the accuracy of the life-expectancy evaluations. They could not, by reference to market trends, independently assess the prospective value of their investments in [the promoters'] viatical settlement contracts.

*Mutual Benefits*, 408 F.3d at 744.

Therefore, considering the Supreme Court's instruction to apply its definition of a security broadly to "schemes devised by those who seek the use of the money of others on the promise of profits," *Howey*, 328 U.S. at 299, the Court is persuaded by the Eleventh Circuit's reasoning in *Mutual Benefits* and the other authorities cited here, and finds that the life settlements Giger purchased are securities under federal and Illinois law.

## III. Whether Ahmann and Lange Made Material Misrepresentations or Omissions.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), makes it "unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe . . . ." SEC Rule 10b-5 makes it "unlawful for any person . . . (a) To employ any device, scheme or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, or; (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purpose or sale of any security." The elements of a claim under section 10(b) of the Securities Exchange Act are: "(1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011).

Giger alleges that Ahmann and Lange made both material misrepresentations and omissions regarding the solvency of A&O, PCI, and Midwest Medical, and the trustworthiness of the individuals running those companies. Specifically, Giger alleges that Ahmann and Lange neglected to tell him the following:

- A&O failed to file a federal exemption D, R. 165 ¶ 64(a);

- A&O failed to register with the State of Illinois, R. 165 ¶ 64(b);

- A&O admitted to "cold calling" in the State of Illinois, R. 165 ¶ 64(c);[5]

- the State of Texas Department of Insurance had obtained a Cease and Desist Order against PCI in November 2006, R. 165 ¶ 64(d);[6]

- PCI was not registered to do business anywhere in the U.S., R. 165 ¶ 64(e);

- the owners of A&O had little or no experience in life settlements and never worked in the institutional market for resale of life settlements to banks and hedge funds, R. 165 ¶ 64(g)

- the owner of Midwest Medical, George Kindness, was convicted of misbranding of drugs placed into interstate commerce with the intent to mislead, R. 181 at 5;

- the SEC considered PCI to be a dubious and unlicensed bonding company, R. 165 ¶ 64(i);

- Bayou City Escrow was not an established escrow company, R. 165 ¶ 64(k);

- the Server policy was still within the contestability period, R. 165 ¶ 64(l);

- the premiums for the Mangione policy were six months in arrears, R. 165 ¶ 64(m);

---

[5] This occurred after Giger purchased the life settlements, and thus, its omission by Ahmann or Lange at the time of sale is not actionable.

[6] This also occurred after Giger purchased the life settlements and is not actionable.

- a principal of A&O, Adley Wahab, had been previously convicted of the felony of forgery of a commercial instrument, R. 181 at 4; and

- a principal of PCI, Harold Meridon, was convicted of conspiracy to commit mail and wire fraud in Florida, R. 181 at 4.

Giger also alleges that he relied on the following misrepresentations:

- Ahmann and Lange told him that all of the premiums due for the life expectancy of the insured would be pre-paid, in full, R. 165 ¶ (f);

- Ahmann and Lange told him that PCI insured all imported Hyundai automobiles, R. 165 ¶ (j);

- Ahmann and Lange told him that PCI's 5A rating from Dunn & Bradstreet reflected good credit, R. 181 at 5; and

- Ahmann told him that Ahmann "had done his own 'due diligence' to ensure the safety of these investments, and the representations [Ahmann] was making." R. 165 at 7.

Turning first to the alleged omissions, Ahmann argues that facts about the legal standing of the relevant companies and the criminal backgrounds of their principals are public information that he did not have a duty to disclose. R. 178 at 10. But this understates Ahmann's duty to disclose public information. The Seventh Circuit has explained that "[s]ecurities law requires issuers to disclose firm-specific information," *Fulton Cnty. Employees Retirement Sys. v. MGIC Inv. Corp.*, 675 F.3d 1047, 1050 (7th Cir. 2012), that is not already reflected in the stock price of a public company. *See Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 758-59 (7th Cir. 2007). Thus, only "news that concerns the industry or economy as a whole" does not have to be disclosed. *Fulton Cnty. Employees*, 675 F.3d at 1050.

Here, Giger alleges that Ahmann and Lange failed to tell him about not merely "the industry or economy as a whole," but information specific to the

14

companies whose solvency was integral to the profitability of Giger's investments. Thus, Ahmann and Lange were under a duty to disclose this information if they knew it.

Ahmann and Lange, however, cannot be liable solely for failing to tell Giger information they themselves did not know. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 946 (7th Cir. 1989); *Sunstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1045 and n.20 (7th Cir. 1977); *see also Pugh v. Tribune Co.*, 521 F.3d 686, 694 (7th Cir. 2008) (a reckless failure to disclose information cannot be based on evidence that "verifying the accuracy of" the information "would have been 'a relatively easy task.'"); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999) ("It is well established that a pleading of scienter may not rest on a bare inference that a defendant 'must have had' knowledge of the facts. Likewise, allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which courts, on numerous occasions, have determined to be inadequate . . . .") (citations and internal quotation marks omitted). Ahmann and Lange contend that they did not know that A&O, PCI and Midwest Medical were unstable and run by people who had been convicted of crimes. R. 189 at 9; R. 187 at 4, 7. And Giger has produced no evidence to suggest that Ahmann and Lange knew this information. To the contrary, Giger admits that Lange himself purchased life settlement policies from A&O, suggesting that Lange was not aware of the potential for such an investment to go bad. R. 180 ¶ 26. Thus, if Ahmann and Lange did not

know the legal standing of the relevant companies and the criminal backgrounds of their principals, their failure to disclose this information is not actionable.

Giger also alleges that Ahmann and Lange either misrepresented that the premiums on the underlying policy would be pre-paid or failed to disclose that they would not be pre-paid. But Giger only alleges that Ahmann and Lange acted as sales agents for A&O, and not that they had any responsibility for ensuring that the premiums were paid. *See generally* R. 165. Accordingly, if Ahmann and Lange did not know that the premiums either had not been or would not be pre-paid, their misrepresentation or omission regarding this fact is not actionable.

More fundamentally, Giger has presented no evidence that the premiums on the three underlying policies at issue in this case were not paid. Giger alleges that the premiums on the Mangione policy were in arrears, but that policy is not at issue in this case. Absent this knowledge, Ahmann and Lange's misrepresentation or omission regarding pre-payment of the premiums is not actionable. Similarly, Giger has not alleged that Ahmann or Lange knew that one of the policies underlying Giger's investments was still within the contestability period, contrary to the representations in the written documents.

Nevertheless, Giger also alleges that Ahmann told him in Lange's presence that PCI "reinsure[s] all of the Hyundai's that are shipped to the United States," R. 183-1 at 72:14-15; 345:6-11, and misrepresented that the "5A" rating Dunn & Bradstreet gave PCI was a credit rating. R. 181 at 5. Neither Ahmann or Lange have asserted that PCI actually did insure Hyundai's U.S. imports, and Dunn &

16

Bradstreet's "5A" rating describes PCI's "net worth" not its "credit appraisal." R. 165-2 at 14. These alleged misrepresentations are a sufficient basis for a reasonable jury to find that Ahmann and Lange violated § 10(b). It may be that the jury will find that these misrepresentations were not material, but that is a question of fact for the jury.

Furthermore, Giger alleges that Ahmann told him that Ahmann "had done his own 'due diligence' to ensure the safety of these investments, and the representations [Ahmann] was making." R. 165 at 7. Giger testified at his deposition that Ahmann told him about "all the due diligence that [Ahmann] had performed . . . ahead of time, stating that this was a guaranteed investment." R. 183-1 at 75:20-22. Giger also testified that when he asked Ahmann for background on the companies, Ahmann said that their financials were not publicly filed but assured him that "these guys were previously working for large firms that mainly dealt with large banks and the like who would invest in these types of investments, and now A&O was going to take that to the retail market." R. 183-1 at 60:19 – 61:6.[7] These statements are the equivalent of a representation that the companies and individuals responsible for the security of Giger's investments were solvent and trustworthy. Ahmann contends that he did not have any knowledge of the information in the public record reflecting the questionable legal statuses of the companies and the past criminal convictions of the people responsible for managing

---

[7] The Court considers this testimony because it is in the record and relevant to these motions, even though Giger does not cite these statements by Ahmann in his complaint or briefs as examples of misrepresentations that form the basis of his claims.

Giger's life settlements. But if Ahmann did not know these publicly available facts, this is evidence that he lied to Giger when he told him that he had done due diligence on the companies and individuals. It is one thing to be *mistaken* in one's representation as to a certain fact; it is another thing entirely to *lie* about whether one has checked if a certain fact is true. The evidence Ahmann lied to Giger about checking facts relevant to Giger's investment is sufficient for a jury to find that Ahmann violated the securities laws.

## IV. Whether Giger Disclaimed Any Reliance on Ahmann or Lange's Representations or Omissions.

The deal documents Giger signed included a "no-reliance" clause, which provided the following:

> Account Holder [i.e., Giger] represents and warrants that Account Holder has not relied on any statements, representations or warranties, whether verbal or in writing, made by Houston Tanglewood Partners, LLC, its agents, attorney's, and/or advisers with respect to Account Holder's decision to enter into this agreement or loan the funds identified herein.

R. 165-1 at 17. Ahmann and Lange both argue that this clause absolves them of any liability for oral misrepresentations they made prior to Giger's signing the deal documents, citing the Seventh Circuit's holding to this effect in *Rissman v. Rissman*, 213 F.3d 381 (7th Cir. 2000).

As an initial matter, the record does not clearly indicate whether Ahmann or Lange are Houston Tanglewood's "agents, attorney's, and/or advisers." Giger alleges that Ahmann and Lange were sales agents for J.W. Cole Financial, Inc.—a former

defendant in this case—and that they sold a life settlement product offered by A&O. Their relationship with Houston Tanglewood, if any, remains a question of fact.

In any event, "no-reliance" clauses are not necessarily dispositive of the reliance element of a § 10(b) claim. The Seventh Circuit has explained that "no-reliance clauses are called 'big boy' clauses (as in 'we're big boys and can look after ourselves'). But if someone who is not a big boy—indeed is not even represented by counsel—signs a big-boy clause, there can be a problem, . . . [requiring] an inquiry into the circumstances of its negotiation, to make sure that the signatory knew what he was doing." *Extra Equipamentos E Exportacao Ltda. v. Case Corp.*, 541 F.3d 719, 724 (7th Cir. 2008). Giger is a doctor, not a professional investor, and he was not represented by counsel for purposes of purchasing this investment. Thus, the existence of a no-reliance clause is not dispositive of whether Giger relied on Ahmann and Lange's representations.

Furthermore, courts in this District have held that misrepresentations regarding facts that are outside the terms of the written contract are not covered by a contract's "no-reliance" clause. *See Deluxe Media Servs., LLC v. Direct Disc Network, Inc.*, 2007 WL 707544, at *9 (N.D. Ill. Mar. 2, 2007); *Reis Robotics USA, Inc. v. Concept Indus., Inc.*, 462 F. Supp. 2d 897, 910 (N.D. Ill. 2006). The deal documents in this case did not make any representations regarding PCI's relationship with Hyundai (if any), did not mention PCI's Dunn & Bradstreet rating, and did not name Ahmann or describe any due diligence he may have done. Therefore, whether Giger relied on Ahmann or Lange's misrepresentations or

omissions remains a question of fact for a jury. *See Cozzi Iron & Metal, Inc., v. U.S. Office Equipment, Inc.*, 250 F.3d 570, 574 (7th Cir. 2001); *Rissman v. Rissman*, 213 F.3d 381, 385 (7th Cir. 2000).

## V. Whether Giger Reasonably Relied on Ahmann or Lange's Representations or Omissions.

Both Ahmann and Lange also argue that the facts show that Giger did not reasonably rely on any misrepresentations or omissions they may have made. R. 178 at 12-13; R. 174 at 7-8.

Ahmann generally argues that Giger's reliance was unreasonable as a matter of law because Giger is a sophisticated investor and he had no prior business relationship with Ahmann. But Giger is a doctor by profession, so it would be reasonable for a jury to conclude that he is not a sophisticated investor. Furthermore, Ahmann does not specifically address whether it was reasonable for Giger to rely on Ahmann's representations about Hyundai, Dunn & Bradstreet, or Ahmann's due diligence.

Rather than argue that Giger's reliance was unreasonable, Lange argues that Giger did not rely on Lange's statements at all. Lange contends that Giger admitted as much at his deposition when Giger testified that he had already decided to invest in life settlements when he first met Lange on April 12, 2006, and that he would not have invested on Lange's advice alone, to argue that Giger did not rely on Lange's representations and omissions. R. 174 at 7-8. Giger, however, also noted in his testimony that Lange did not contradict Ahmann's statement that PCI insured Hyundai's exports to the United States. R. 183-1 at 345:9-11. Thus, Giger's

deposition testimony is ambiguous and does not settle the question of whether Giger relied on Lange's advice in deciding to invest. Whether Giger relied on Lange comes down to whether a jury believes Giger's testimony in the context of all the other circumstances.

Relatedly, Lange argues that he cannot be liable for any misrepresentation or omission he may have made because he owed no duty to Giger. This is an incorrect statement of the law. "Duty" is not an element of a § 10(b) claim. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011). Rather a duty to disclose arises because "incomplete disclosures, or 'half-truths,' implicate a duty to disclose whatever additional information is necessary to rectify the misleading statements." *Schlifke*, 866 F.2d at 944. Thus, a jury can find that Lange violated § 10(b) as long as there is sufficient evidence for a jury to find that Lange failed to disclose information material to Giger's investment decision.[8] As discussed previously, such evidence is present, at least in a contested form.

Ahmann also argues that a reasonable jury could not find that he committed common law fraud because justifiable reliance under Illinois law must meet a standard of "ordinary prudence" as opposed to the recklessness standard in federal

---

[8] Lange also argues that he is not a proper defendant from whom to seek rescission because it is not within his means to restore the status quo. R. 174 at 13. The Illinois Supreme Court has held, however, that "[r]estoration of the status quo ante will not be required when restoration has been rendered impossible by circumstances not the fault of the party seeking rescission, and the party opposing the rescission has obtained a benefit from the contract." *Int'l Ins. Co. v. Sargent & Lundy*, 609 N.E.2d 842, 853 (Ill. 1993). There is no evidence that Giger is responsible for Lange's alleged inability to restore the status quo, and there is evidence that Lange received a benefit from selling the life settlements to Giger. Thus, Giger may seek rescission from Lange.

law. *See Soules v. General Motors Corp.*, 402 N.E.2d 599, 601 (Ill. 1980). There is, however, some authority questioning whether "ordinary prudence" is the correct standard under Illinois law. *See AMPAT/Midwest, Inc. v. Ill. Tool Works Inc.*, 896 F.2d 1035, 1042-43 (7th Cir. 1990); *Household Comm. Fin. Servs., Inc. v. Schottenstein*, 1991 WL 111206, at *1 (N.D. Ill. 1991). Whatever the standard, the evidence is not so one-sided for the Court to rule that Giger's reliance was not justified as a matter of law; rather that is a question for a jury.

## VI. Whether There Is Evidence that Ahmann or Lange Violated the Illinois Consumer Fraud Act.

Ahmann argues that he cannot be liable under the Illinois Consumer Fraud Act because Giger does not allege that Ahmann intended not to break the promises provided in the deal documents. R. 178 at 17-18. The Court has already explained that Giger has not presented sufficient evidence to show that Ahmann was responsible for ensuring that the premiums were paid or that the underlying policies were beyond their the contestability periods. But Giger *has* presented evidence that Ahmann misrepresented PCI's relationship with Hyundai, the significance of PCI's rating by Dunn & Bradstreet, and whether he had researched the solvency and trustworthiness of the relevant companies and individuals, such that a reasonable jury to find that Ahmann violated federal securities laws. This evidence is also sufficient for a reasonable jury to find that Ahmann violated the Illinois Consumer Fraud Act.

Lange argues that he cannot be liable under the Illinois Consumer Fraud Act because Giger does not allege that Lange engaged in a "deceptive act." But to the

extent that a jury can find that Lange made misrepresentations or omissions regarding PCI's relationship with Hyundai and the significance of PCI's rating by Dunn & Bradstreet, a reasonable jury could find that Lange violated the Illinois Consumer Fraud Act.

## VII. Whether Giger Failed to Preserve His Illinois Securities Law Claims.

Ahmann argues that Giger failed to provide sufficient notice of his Illinois Securities Law claim. The Illinois Securities Act, 815 ILCS 5/13 provides that plaintiffs can seek rescission for securities fraud. Subsection (B) provides that

> Notice of any election provided for in subsection A of this Section shall be given by the purchaser within 6 months after the purchaser shall have knowledge that the sale of the securities to him or her is voidable, to each person from whom recovery will be sought, by registered mail or certified mail, return receipt requested, addressed to the person to be notified at his or her last known address with proper postage affixed, or by personal service.

The statute also provides alternative methods for calculating rescission damages in a securities fraud claim. *See* 815 ILCS 5/13(A).

Giger alleges that he sent Ahmann and Lange (along with other individuals at A&O and Houston Tanglewood) a letter on March 19, 2008, by UPS overnight delivery, demanding that they return the $2.1 million he had invested with them and threatening action under "Federal and State securities law." R. 183-8 at 6-10. The letter set out in detail the factual allegations supporting Giger's claims.

Ahmann cites *Jacks v. Schneider Securities, Inc.*, 217 F.3d 525 (7th Cir. 2000), to argue that Giger did not comply with the statutory notice requirements because his letter of March 19 failed to specifically mention Illinois securities law.

23

In *Jacks*, the Seventh Circuit found the plaintiff's notice insufficient because the notice failed to specifically mention Illinois law and identify the applicable damages calculation provision in the Illinois statute.

Contrary to Ahmann's argument, the statutory language itself does not require that the notice specifically mention Illinois law. The force of the Seventh Circuit's holding in *Jacks* is not that the notice must specifically mention Illinois law, but rather, that the notice must unambiguously convey what *remedy* the plaintiff is seeking. In *Jacks*, neither of the plaintiff's two letters specified how rescission damages should be calculated. The Seventh Circuit reasoned that this ambiguity would have been resolved if the plaintiff had referred to a specific provision in the statute. *See Jacks*, 217 F.3d at 528-29.

Here, Giger's letter unambiguously stated that he sought return of the $2.1 million he invested. Thus, the content of Giger's letter satisfies the notice statute.

Ahmann also cites *Waste Management of Illinois, Inc. v. Illinois Pollution Control Board*, 826 N.E.2d 586, 590-92 (Ill. App. Ct. 3d Dist. 2005), and *Audio Enterprises, Inc. v. B & W Loudspeakers of America*, 957 F.2d 406, 409 (7th Cir. 1992), to argue that Giger did not satisfy the notice statute because he used UPS to send the letter rather than the registered or certified mail specifically mentioned in the statute. Both of these cases, however, focused not on the carrier that delivered the notice, but whether there was documentary proof from the carrier that the notice had been delivered. To the extent that Ahmann has not admitted that he received the notice and Giger has not produced confirmation that the letter was

delivered, whether Giger complied with the Illinois Securities Act's notice provision is a question of fact for a jury.[9]

## Conclusion

For the foregoing reasons, Ahmann's motion, R. 176, and Lange's motion, R. 173, are denied.

This case was filed in July of 2009. The motions for summary judgment have been fully briefed since December 19, 2012, and through no fault of the parties, a ruling did not take place until this day.

The case is set for status on January 8, 2014. At that time the parties should inform the Court whether the case should be referred to Magistrate Judge Valdez for a settlement conference. Absent that, a prompt trial date will be set so that this 2009 case can be resolved.

ENTERED:

_Thomas M Durkin_
_____
Honorable Thomas M. Durkin
United States District Judge

Dated: December 20, 2013

---

[9] Lange admits that he received this letter. R. 186 ¶ 40.

25